## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| HANNAH BOCKER, SARAH BOCKER and BARBARA BOCKER as Administrator of the Estate of GERARD BOCKER and BARBARA BOCKER, Individually | : : : : : | |
| Plaintiffs, | : : | C.A. NO. |
| v. | : : | |
| HARTZELL ENGINE TECHNOLOGIES LLC 2900 Selma Highway Montgomery, AL  36108; | : : : : : | JURY TRIAL DEMANDED |
| CONTINENTAL AEROSPACE TECHNOLOGIES, INC. f/k/a CONTINENTAL MOTORS, INC. 2039 S. Broad Street Mobile, AL  36615; and JOHN DOES 1-10; | : : : : : : | |
| Defendants. | : : | |

## CIVIL ACTION COMPLAINT

Plaintiffs, by their attorneys, The Wolk Law Firm and Farnan LLP complaining of the Defendants, respectfully allege upon information and belief:

## THE PARTIES

1.      At all times herein mentioned, Plaintiff HANNAH BOCKER was and still is a resident of the County of Dutchess, State of New York.

2.      At all times herein mentioned, Plaintiff BARABARA BOCKER was and still is a resident of the County of Dutchess, State of New York.

3.      On June 29, 2020 BARABARA BOCKER was appointed by the Dutchess County Surrogate as Administrator of the Estate of GERARD BOCKER, and was the wife of GERARD BOCKER at the time of his death.

4.      At all times herein mentioned, Plaintiff SARAH BOCKER was and still is a resident of the County of Dutchess, State of New York.

5.      Plaintiffs HANNAH BOCKER and SARAH BOCKER are each natural daughters of Plaintiff BARBARA BOCKER and GERARD BOCKER, deceased.  Also surviving GERARD BOCKER is his natural son, WILLIAM BOCKER.

6.      Defendant CONTINENTAL MOTORS, INC. n/k/a CONTINENTAL AERO CONTINENTAL AEROSPACE TECHNOLOGIES, INC. ("Continental") is a Delaware corporation and maintains a principal place of business at 2039 S. Broad Street, Mobile, Alabama 36615.

7.      Defendant HARTZELL ENGINE TECNOLOGIES LLC ("Hartzell") is a Delaware corporation and maintains a principal place of business at 2900 Selma Highway, Montgomery, Alabama  36108.

8.      That JOHN DOES 1-10 are individuals who serviced, inspected, repaired, maintained, modified or overhauled the aforementioned Cessna model 303 airplane bearing registration number N303TL on or before August 17, 2019, true identities unknown.

9.      That on August 17, 2019 and all times herein mentioned the residence of the plaintiffs located at 235 South Smith Road, Union Vale, New York was in the known flight path of Sky Acres Airport.

## JURISDICTION AND VENUE

10.     This action is based on diversity jurisdiction pursuant to 28 U.S.C. § 1332 as Plaintiffs are citizens of different states from Defendants and the amount in controversy exceeds $75,000.00. Jurisdiction in this District is also proper since one or more Defendants are incorporated in this State as set forth above. Further, all Defendants do business within this State of Delaware, by availing themselves of the business opportunities here, regularly doing or soliciting business, engaging in other persistent course of conduct in this State, deriving substantial revenue from services, or things used or consumed in this State, advertising the availability of parts and information, shipping parts and literature into the State of Delaware, offering services to residents of the State of Delaware, and receiving money from those businesses in this State who order goods, services and parts and pay for them. In addition, Defendants supply literature to aircraft owners located within the State of Delaware, and to mechanics, fixed base operators, and others who perform maintenance in this State for purposes of providing information and knowledge as to parts that can be purchased from the Defendants for the repair of aircraft, or the repair or replacement of their engines, accessories, assemblies, components, and parts.

11.     Venue is proper in that one or more Defendants are incorporated in the State of Delaware, and all Defendants regularly conduct business in the State of Delaware and/or may be served here.

12.     At all times mentioned herein, Defendants, and each of them, were the agents, servants, and/or employees of the remaining Co-Defendants. All Defendants were either joint tortfeasors or otherwise secondarily liable for said acts and omissions of all other Defendants.

13.     Each of the Defendants did support these components in this County, interact with the other defendants in this county, and the turbo was designed and supplied from this county.

14.     The amount in question is greater than the jurisdictional amount required by this Court.

15.     Thus, Jurisdiction and venue are appropriate in this Court.

## FACTUAL BACKGROUND

16.     This matter arises from the August 17, 2019 crash of a Cessna T303 aircraft, bearing registration number N303TL, in Lagrangeville, New York, manufactured by Cessna, who is the current type certificate holder.

17.     This aircraft is equipped with twin-piston turbocharged engines, manufactured by Continental Motors.

18.     The aircraft was piloted by Francisco Knipping-Diaz, who sustained fatal injuries in the crash.

19.     Also on board were Teófilo Antonio Diaz and Eduardo Tio as passengers, who survived the crash.

20.     The accident aircraft had landed at Sky Acres Airport (44N) in Lagrangeville, New York, where it received fuel before takeoff, following a business meeting at Orange County Airport (MGJ) in Montgomery, New York.

21.     After receiving fuel, the pilot started the engines of the accident aircraft, and departed Sky Acres Airport in day visual meterological conditions, with a destination of Republic Airport (KFRG) in Farmingdale, New York.

22.     The pilot then departed the airport on Runway 17 at Sky Acres.

23.     Shortly after takeoff the aircraft lost engine power at a low altitude, and was unable to climb.

24.     The aircraft began to drift left, and the pilot attempted to straighten its course, continuing over the end of the runway and approached obstacles.

25.     Ultimately the plane was unable to climb due to the power loss, rolled left and impacted the Bocker residence, trees and the ground.

26.     Inside the Bocker residence was Hannah Bocker, her father Gerard Bocker, and sister Sarah Bocker.

27.     The aircraft almost immediately burst into flames as did the Bocker's house.

28.     In fact, Hannah and her father, Gerard Bocker, were inside, and witnessed the conflagration which ensued.

29.     Sadly, Gerard Bocker was consumed by the fire and perished.

30.     Hannah Bocker was severely burned all over her body due to the fire.

31.     Sarah Bocker, was able to jump out of a window of the house, suffering injuries and witnessing the horrors which befell her family.

### BACKGROUND OF THE ACCIDENT AIRCRAFT AND ITS ENGINES

32.     The accident Cessna T303 "Crusader" (the "Crusader" or "T303") is pictured, below:



33.     The aircraft has a cabin which seats four passengers, with room for a pilot and an additional crew member or passenger in the front.

34.     It is equipped with two Continental (L)TSIO-520-AE3B piston engines each rated at 250 HP, which were counter-rotating and turbocharged.

35.     The purpose of turbocharging an engine is to increase its performance at higher altitudes, as the air thins and becomes less dense, so that the fuel/air mixture can remain at or close to that at sea-level.

36.     In the event that a turbocharger malfunctions or seizes, then the engine will not receive an appropriate fuel/air mixture and cause a loss of power.

37.     The turbochargers in the accident aircraft are the responsibility of the Hartzell defendants.  Upon information and belief, AiResearch, Inc., was purchased by and merged with and/or changed its name to Garrett AiResearch Corp. Garrett AiResearch Corp. was subsequently purchased by and merged with and/or changed its name to Garrett Corp. Garrett Corp. was purchased by and merged into Signal Oil & Gas Co. in 1964. Signal Oil & Gas Co. changed its name to Signal Companies, Inc. in 1968. Signal Companies, Inc. merged with Allied Corp. to form Allied-Signal Inc. in 1985. AlliedSignal Inc. changed its name to Honeywell International, Inc., in 1999.  Subsequent to that sale and merger, the turbocharger's product line holder became Kelly Aerospace, and then transferred that product line to the Hartzell defendants at all times material hereto.

38.     AiResearch, Inc., Garrett AiResearch Corp., Garrett Corp., Signal Oil & Gas Co., Signal Companies, Inc., Allied-Signal Inc., and AlliedSignal, Inc. no longer have any corporate existence, and have had all of their assets, product lines, liabilities, good will, trade names, patents, employees and accounts receivable transferred to the Hartzell defendants, who assumed all liabilities of these companies.

39.     As Hartzell's corporate predecessors (AiResearch, Inc., Garrett AiResearch Corp., Garrett Corp., Signal Oil & Gas Co., Signal Companies, Inc., Allied-Signal Inc., and AlliedSignal, Inc., etc.) no longer exist, and others have transferred the product line entirely to the Hartzell defendants, Hartzell is the successor in interest for the turbocharging components aboard the accident aircraft.

40.     The Crusader, is further notorious for its difficult handling conditions, particularly when a power loss occurs.

41.     In the event of single engine operation due to a power loss in one engine, rudder trim is inadequate to overcome the adverse yaw of one engine.

42.     The Crusader further has a low climb rate, which becomes negligible in the event of a loss of power.

43.     Furthermore, in the event that a power loss occurs on takeoff, the Crusader has a very long accelerate/stop distance, giving a pilot the inability to try and accelerate to takeoff and then stop on the runway such as at Sky Acres, in the event of an emergency.

44.     Worse yet, the single engine climb rate of the Crusader is negative until the gear are raised with a windmilling prop, and increases further if the propeller is not feathered, leaving no margin of safety in in the design of the aircraft in the event of a power loss.

45.     For these reasons, it is critical the engines perform on takeoff, and if they do not, a pilot is faced with a dangerous and immediate emergency situation.

46.     In normal operation, T303 Crusaders have a history of engine power losses due to fuel delivery malfunctions and malfunctions of turbochargers.

47.     In the event of a turbocharger malfunction, a power loss is imminent, which is particularly dangerous on takeoff.

## ACCIDENT INVESTIGAION

48.     Post-crash investigation confirmed the witness statements that the aircraft suffered a loss of power, resulting in its failure to climb, and inability for the pilot to maintain directional control.

49.     This loss of power occurred unexpectedly, just after the aircraft took off from the airport.

50.     The pilot of the aircraft, Francisco Knipping-Diaz, was not able to climb in the aircraft following this power loss.

51.     As such, the pilot made a forced landing on the Bocker residence, and the aircraft and the house immediately caught fire.

52.     Plaintiffs Hannah Bocker, Sarah Bocker and their father, Gerard Bocker, deceased, were inside the residence at the time.

53.     Post-crash investigation of the accident aircraft confirm that it was not capable of making sufficient power to remain airborne.

54.     If the fuel system of the aircraft does not provide sufficient fuel, and fuel free of contaminants, the engines are unable to make rated power.

55.     Further, investigation reveals that the aircraft's turbocharger wastegates were in vastly different positions, with the left wastegate nearly closed, confirming that the engine was demanding additional boost due to issues with its induction system.

56.     In fact, in the event of a turbocharger seizure or induction blockage, the wastegate on an engine will attempt to raise the manifold pressure, just as was found post-accident on the subject left engine.

57.     If the fuel/air mixture provided to the engine is not appropriate, it will further be unable to make rated power.

58.     Furthermore, the signatures in the propellers and control levers confirm that the aircraft was not making rated power on takeoff.

59.     Additionally, passenger and witness statements confirm the fact the accident aircraft suffered a powerplant failure and was unable to perform as a result.

60.     Due to the design characteristics of the T303, above, the loss of power resulted in the inability of the aircraft to climb at a positive rate.

61.     Moreover, the aircraft had just received fuel prior to departure.

62.     Due to the design of the fuel system, and contaminants were not sufficiently removed, this further contributed to the engines' inability to make rated power and take off successfully.

63.     The accident aircraft and its engines received regular inspections by SouthTecAviation  on or about July 17, 2019, who signed off on the aircraft as airworthy and safe to fly, as evidenced by the logbook entries which accompanied the service performed.

64.     Prior to that inspection, Berkshire Aviation performed inspections on the accident aircraft, similarly signing off on it as airworthy and also installed an overhauled and inspected left engine in the accident aircraft following a runway incident and sudden stoppage inspection.

65.     The left engine was inspected and repaired by Pine Mountain Aviation, who replaced numerous components during that work, including new cylinder assemblies by Continental Motors, and other new components from the Hartzell and Continental defendants herein, as well as newly overhauled magnetos, and other components necessary for the engine to run properly.

66.   That engine was equipped with turbo components manufactured by the Hartzell defendants, which did malfunction and cause and contribute to the power loss experienced on board the aircraft on the day of the accident.

67.   These engine assemblies were selected by the Continental along with the aircraft's manufacturer, Cessna Aircraft Company.

68.

## DAMAGES

69.   Plaintiff HANNAH BOCKER was 22 years old at the time of the accident.

70.   HANNAH BOCKER was in her family home when the accident aircraft impacted it, causing it to ignite and catch fire.

71.   HANNAH BOCKER suffered severe burns all over her body, smoke inhalation, fear of impending death, and jumped out of the home suffering physical injuries to avoid further injury and death due to this crash.

72.   Plaintiff HANNAH BOCKER has undergone numerous surgeries and continues to receive treatment for the injuries, disfigurement, pain and suffering she has endured due to this accident.

73.   Plaintiff SARAH BOCKER was 31 years old at the time of the accident.

74.   SARAH BOCKER was also in the home when the aircraft impacted it, and was forced to exit through a window, witnessing the accident, fire and injuries to her sister and father.

75.   Plaintiffs' decedent GERARD BOCKER was 61 years old at the time of the accident.

76.   GERARD BOCKER was in his home at the time the accident aircraft impacted it and caused it to ignite.

77.     GERARD BOCKER perished after the impact due to thermal injuries.

78.     Before Plaintiffs' decedent GERARD BOCKER was killed on September 17, 2019, he was caused to experience excruciating conscious pain and suffering as well as fear of impending death.

79.     GERARD BOCKER is survived by his wife, BARBARA BOCKER, and children, HANNAH BOCKER, SARAH BOCKER, and WILLIAM BOCKER, who have lost his love, care, affection, guidance, tutelage, consortium, and support.

80.     Plaintiffs bring this action against Defendants seeking damages for their injuries and for the death of GERARD BOCKER. Plaintiffs seek recovery of damages to which Plaintiffs are entitled, including, but not limited to, damages pursuant to the applicable wrongful death and survival statutes, damages for personal injuries, loss of earnings, loss of net accumulations, loss of inheritance, emotional and physical pain and suffering, loss of comfort, care, companionship, past and future medical care and expenses together with damages for pre-crash and post-crash physical pain and suffering, emotional anguish, terror and fright, and negligent infliction of emotional distress.

81.     Plaintiffs seek damages for their ongoing injuries, damages, and future pain and suffering which she has as a direct result of the subject accident.

82.     Further, Plaintiffs seek punitive damages, to the extent available, for the conduct of the Defendants that caused their injuries and Damages.

83.     Further, on August 17, 2019 and all times herein mentioned BARBARA BOCKER was a fee simple owner of the property and premises at 235 South Smith Road, Union Vale NY.

84.    That in the abovementioned airplane crash of August 17, 2019 the house which had been Plaintiffs' home at 235 South Smith Road, Union Vale NY was burned beyond repair and most of its contents destroyed.

85.    That due to the negligent, careless and reckless acts of the defendants, Plaintiff BARABARA BOCKER lost the use and value of her home as well as her personal property and family heirlooms and became liable for a costly demolition and remediation.

86.    Plaintiff BARABARA BOCKER maintains this claim for all members of her family as the title ownership of many of the items of personal property lost in the crash and fire were jointly within the family.

87.    That by reason of the foregoing, BARBARA BOCKER asserts a claim and has been damaged in a sum exceeding the jurisdictional limits required by this Court.

88.    Plaintiffs seek recovery of all available damages, including but not limited to, loss of earnings and earning capacity, loss of net accumulations, loss of society and companionship, loss of guidance and tutelage, loss of advice and counsel, loss of life's pleasures, loss of support, loss of services, loss of consortium, loss of inheritance, pre-impact fear, conscious pain and suffering, the pecuniary value of loss of such services, funeral and internment expenses, estate expenses, medical expenses, additional costs of household maintenance, and any other damages the fact finder deems fair and equitable.

89.    Punitive damages are demanded for the knowing, willful, unjustifiable, and outrageous conduct by the Defendants in ignoring the actual knowledge, actual warnings, actual signs and actual experience with the serious risk of injury or death, without doing anything to prevent serious personal injury or death as a result.

**Count I**
(STRICT LIABILITY)
*Plaintiffs v. Defendants Continental Motors and Hartzell Engine Technologies*

90.     Plaintiffs incorporate the above paragraphs as though set forth at length herein.

91.     The Continental and Hartzell defendants are in the business of designing, manufacturing, testing, certifying, distributing, selling, supplying and/or providing aircraft engines and component parts, including turbochargers and related components.

92.     Further, these defendants are in the business of designing, inspecting, testing, distributing, selling, supplying, rebuilding, servicing, supporting, marketing, aircraft engines as well as aftermarket and OEM parts, in particular turbo charging systems, including turbochargers, waste gates, turbo controllers, check and oil return valves and associated system components and are the parts manufacturer authorization, technical standard order, supplemental type certificate holder, type certificate holder, and/or production certificate holder responsible to ensure the continuing airworthiness of such products.

93.     In fact, these defendants did originally design, manufacture, sell and distribute the accident aircraft engines, turbochargers and replacement parts.

94.     At all times material hereto the defendant Continental Motors was the Type Certificate Holder for the accident aircraft engines.

95.     The defendants designed, manufactured, tested, certified, distributed, sold, supplied and/or provided the defective and unreasonably dangerous accident aircraft engines and its component parts including the engines and turbochargers and fuel delivery system within the engine assemblies.

96.     These defendants did further specify the fuel settings for the fuel servo, turbo waste gate, turbocharger and associated components; and did provide continuing airworthiness for these components, and are responsible for their ongoing support and safety.

97.     In addition, these defendants provided instructions for continued airworthiness for the accident aircraft engines and turbochargers.

98.     The dangerous defects which caused this accident existed at the time the accident aircraft's engines and its component parts were first sold, in that:

a.      The defects in the aircraft engines, turbochargers and fuel delivery system existed at the time these components overhauled and sold by the defendants; and

b.      The defects existed at the time the defendants distributed these components;

c.      The defendant failed to warn of these defects; and

d.      The defendant failed to provide adequate instruction for continued airworthiness and failed to provide engine troubleshooting information describing probable engine and fuel delivery malfunctions, engine and turbocharging system malfunctions, how to recognize these malfunctions, and the remedial actions for these malfunctions.

99.     The accident aircraft engines, turbochargers and component parts were in substantially the same condition at the time of the accident as when first sold.

100.    The defects which rendered the aircraft unreasonably dangerous and defective were, but are not limited to, the following:

a.      Defective and unreasonably dangerous fuel delivery system;

b.      Defective and unreasonably dangerous engines;

c.      Defective and unreasonably dangerous and complex maintenance and inspection instructions;

14

d.      Defective and unreasonably dangerous engine performance in the event of a turbocharger malfunction;

e.      Defective and unreasonably dangerous turbocharging system;

f.      Inadequate materials used in construction;

g.      Inadequate testing of all engine components;

h.      Inadequate instructions to cope with loss of power;

i.      Inadequate design and construction of the engine to minimize the development of an unsafe condition between overhaul periods;

j.      Defective and inadequate instructions, warnings and information regarding the operation of the aircraft engine and its systems, components, accessories, and hardware;

k.      Defective and inadequate warnings concerning failures of the aircraft engine and its systems, components, accessories, and hardware;

l.      Defective instructions for continued airworthiness in that they failed to provide engine troubleshooting information describing probable engine malfunctions, how to recognize those malfunctions, and the remedial action for those malfunctions;

m.      Defective reporting of failures, malfunctions and defects in the engine products, parts, processes or articles that it has manufactured;

n.      Dangerous and defective systems, assemblies, components, parts and systems of the engine installed on the accident aircraft;

o.      Dangerous, defective and deficient engine, engine assemblies, components and systems, all of which failed to provide useful power to the aircraft and pilot;

15

p.      Defective design and construction of the engine and turbocharging systems, including turbochargers, waste gates, turbo controllers, check and oil return valves and associated system components;

q.      Defective and improper repair and inspection specifications and overhaul information for the engine and turbo charging systems, including turbochargers, waste gates, turbo controllers, check and oil return valves and associated system components;

r.      Improper manufacture of the engine and turbocharging systems, including turbochargers, waste gates, turbo controllers, check and oil return valves and associated system components utilized on the accident aircraft;

s.      Defective and improper materials used for the engine turbocharging systems, including turbochargers, bearings, rotating components and associated system components in the accident engine;

t.      Defective and inadequate warnings concerning the failure modes associated with the accident engine and turbocharging systems;

u.      Improper material selection;

v.      Improper quality control;

w.      Improper continuing airworthiness instructions concerning the engine, and turbocharging systems and associated system components;

x.      Improper size and dimensions of the engine and turbocharging systems, including bearings, shafts, waste gates, turbo controllers, check and oil return valves and associated system components;

y.      Failing to adequately safeguard against malfunctions of the turbocharging system installed on the accident aircraft;

16

z.      The engine and its turbocharging systems and associated system components were not capable of withstanding the naturally and/or foreseeable occurring engine operational stresses without suffering failure and seizure;

aa.      Manufacturing, and selling an turbo charging and normalizing systems, including turbochargers, waste gates, turbo controllers, check and oil return valves and associated system components which did not withstand normal use; and

bb.      Lack of any measures taken to correct these known defects.

101.     The foregoing defective conditions rendered the engine, its turbocharging systems, including turbo chargers and associated system components dangerous beyond a reasonable consumer's contemplation.

102.     These dangers inherent in the engine and turbo charging and normalizing systems, including turbochargers, waste gates, turbo controllers, check and oil return valves and associated system components as described above were unknowable to Plaintiffs and unacceptable to the average or ordinary consumer.

103.     The accident aircraft engines, turbocharging systems, fuel delivery system components and accessories, were placed into the stream of commerce when it was originally sold by these defendants.

104.     At the time of the sale and at all times thereafter, the accident engines, propellers, governors, fuel delivery system components and accessories were in a defective, unairworthy and unreasonably dangerous condition with manufacturing and/or design defects as aforesaid that were hidden and not obvious to the foreseeable users of the engines.

105.     The probability of harm to pilots and passengers including, personal injury, death, death by mutilation, and in some instances death by fire, associated with the inherent design and

manufacturing defects identified herein and above outweigh the burden or cost of taking precautions or utilizing safer alternatively designed products that would have prevented this accident.

106.    The aforesaid inherent design and manufacturing defects increased the likelihood of an in-flight engine failure, had no usefulness or desirability in their condition, and could have been rectified with alternative safer products for little to no cost.

107.    As a result of these defects, the accident aircraft suffered a power loss on takeoff, causing this crash and Plaintiffs' damages, described above.

WHEREFORE, Plaintiffs demand judgment against Defendants, jointly and severally, for compensatory and punitive damages plus pre and post judgment interest, costs, attorney's fees and such other relief as the Court deems appropriate.

## Count II
### (NEGLIGENCE)
### *Plaintiffs v. Defendants Continental and Hartzell Engine Technologies*

108.    Plaintiffs incorporate the above paragraphs as though set forth at length herein.

109.    Defendants Continental and Hartzell are sellers, manufacturers and designers of products and owed duties to Plaintiffs' decedent to act as reasonably prudent manufacturers, designers, sellers, overhaulers, and maintainers and distributors of the subject engines and accessories, including their turbocharging systems and associated system components, and not to design, manufacturer, or sell defective products.

110.    In addition to the duties imposed by common law, Defendants were subject to duties imposed by regulatory law to manufacture products in accordance with mandated engineering data and ones that would not detrimentally affect the airworthiness standards of the

aircraft engine and engine components to which they were installed or render an aircraft unairworthy or unsafe.

111.     Defendants breached their duties and were negligent, grossly negligent, careless, and reckless by virtue of the following:

a.      failed to provide a properly designed engine, turbo charging system, including turbochargers, waste gates, turbo controllers, check and oil return valves and associated system components;

b.      failed to properly manufacture the engine, turbo charging systems, including turbochargers, waste gates, turbo controllers, check and oil return valves and associated system components;

c.      failed to properly provide guidance on setting and maintaining the turbo charging systems, including turbochargers, waste gates, turbo controllers, check and oil return valves and associated system components;

d.      failed to properly design the turbo charging systems, including turbochargers, waste gates, turbo controllers, check and oil return valves and associated system components to function properly between maintenance periods;

e.      failed to properly construct the engine, turbo charging systems, including turbochargers, waste gates, turbo controllers, check and oil return valves and associated system components;

f.      failed to provide adequate instructions, warnings and information concerning the installation, overhaul and replacement of the turbo charging systems, including turbochargers, waste gates, turbo controllers, check and oil return valves and associated system components;

g.      failed to provide adequate instructions, warnings, and information concerning the inspection requirements for the engine, turbo charging systems, including turbochargers, waste gates, turbo controllers, check and oil return valves and associated system components;

h.      failed to utilize a safe and proper design of the engine, turbo charging systems, including turbochargers, waste gates, turbo controllers, check and oil return valves and associated system components;

i.      failed to utilize safe and proper manufacture techniques for the engine, turbo charging systems, including turbochargers, waste gates, turbo controllers, check and oil return valves and associated system components;

j.      failed to select appropriate materials for components and replacement parts utilized in the engine and turbo charging systems and associated system components;

k.      failed to provide proper instructions, warnings, and information concerning the accident engine and turbo charging systems;

l.      failed to provide proper instructions, warnings, and information regarding the use and maintenance of the engine, turbo charging systems, waste gates, turbo controllers, check and oil return valves and associated system components;

m.      failed to provide proper instructions, warnings, and information concerning the inspection, troubleshooting, repair, and overhaul requirements for the accident engine, turbo charging systems, accessories and associated system components;

n.      failed to provide proper warnings concerning the failure modes associated with the accident engine, turbo charging systems, accessories and associated system components;

20

o.      failed to utilize proper material selection;

p.      failed to utilize proper quality control for the accident engine and associated accessories and components;

q.      failed to ensure there would not be an improper turbo condition in normal operation;

r.      failed to supply proper continuing airworthiness instructions concerning the engine, turbo charging systems, accessories and associated system components;

s.      failed to manufacture the engine, turbocharging system and associated components in accordance with size, materials selection, and dimensions mandated by engineering drawings;

t.      failed to adequately safeguard against malfunctions of the turbo charging system;

u.      failed to correct known defects in the engine, turbo charging systems, accessories and associated system components; and

v.      failed to correct, warn and prevent against other defects which will be shown at trial.

112.    As a direct result of these failures and negligence in design and product support, the accident aircraft lost engine power and impacted the Plaintiffs' residence because Defendants supplied components were unreasonably dangerous, defective and did cause Plaintiffs' injuries.

113.    Plaintiffs' injuries and damages, including the death of Plaintiffs' decedent, were caused as a direct and proximate result of the foregoing negligent conduct.

WHEREFORE, Plaintiffs demand judgment against Defendants, jointly and severally, for compensatory and punitive damages plus pre and post judgment interest, costs, attorney's fees and such other relief as the Court deems appropriate.

### Count III
### (BREACH OF EXPRESS AND IMPLIED WARRANTIES)
***Plaintiffs v. Defendants Continental Motors and Hartzell Engine Technologies***

114.    Plaintiffs incorporate the above paragraphs as though set forth at length herein.

115.    Defendants were, and are at all times material hereto, merchants engaged in the business of designing, manufacturing, selling, supplying, supporting, repairing, distributing, licensing, overhauling, maintaining, and assembling engine assemblies, turbo charging systems, including turbochargers, waste gates, turbo controllers, check and oil return valves, accessories and associated system components as well as the associated operation, repair, overhaul, installation and product support materials.

116.    Defendants described and advertised goods for sale, including the engines, turbo charging systems, accessories and associated system components installed on the accident aircraft. Such descriptions and advertisements included, but were not limited to, advertising brochures, instructions, manuals, specification sheets, and other product statements

117.    These descriptions and affirmations concerning the goods resulted in express warranties that the goods were as described and safe for their intended use, airworthy, and conformed to approved and mandated engineering data.

118.    In addition, Defendants provided express warranty for the accident engines, turbo charging systems, accessories and associated system components.

119.    These descriptions, representations, and affirmations resulted in oral and written express and implied warranties with regard the aforementioned components in the accident aircraft engines and turbocharging components.

120.    Defendants expressly and impliedly warranted that the accident aircraft's engine and turbo charging system, including turbochargers, accessories and associated components would operate safely with these components and conformed to required engineering specifications and data.

121.    These descriptions, affirmations, and express warranties became part of the bases of the bargain of their sales and said warranties ran to Plaintiffs' decedent as direct and/or intended third party beneficiaries from the use of the product.

122.    Plaintiffs and Plaintiffs' decedent further relied upon these warranties.

123.    As a result of the sales activities of Defendants, each expressly and impliedly warranted that its individual goods were merchantable, airworthy, fit for their ordinary purpose, conformed to design data, properly labeled and packaged for sale and installation, and conformed to the promises and affirmations of fact made on their containers and labels.  These implied and express warranties ran from Defendants to Plaintiffs and their decedent as direct and/or intended beneficiaries.

124.    As a result of the sales activities of Defendants, they impliedly warranted that their goods were fit for their particular purpose and suitable for the accident engine, and they knew that their skill and judgment would be relied upon and were, in fact, relied upon by the purchaser of their individual goods.

125.   Because Defendants were merchants as to its goods offered for sale, there arises as a result of the "course of dealings" and "usage of trade" an implied warranty that each of its individual goods are safe and conform to design data.

126.   By selling defective goods, Defendants and each of them breached the express warranties and the implied warranties of merchantability and fitness for particular purpose and the implied warranties arising from the course of dealings and usage of trade.

127.   The breaches of warranties included the fact that Defendants did the following:

a.   defective design, manufacture and construction of the engines, fuel delivery system, turbo charging systems, including turbochargers and associated system components, as well as engine accessories;

b.   defective design, manufacture and construction of the engines, fuel delivery system, turbo charging systems, including turbochargers and associated system components, as well as engine accessories;

c.   defective and inadequate instructions, warnings and information concerning the engines, fuel delivery system, turbo charging systems, including turbochargers and associated system components, as well as engine accessories;

d.   defective and inadequate instructions, warnings, and information concerning the inspection requirements and replacement requirements for the engines, fuel delivery system, turbo charging systems, including turbochargers and associated system components, as well as engine accessories;

e.   improper design of the engines, fuel delivery system, turbo charging systems, including turbochargers and associated system components, as well as engine accessories;

24

f.    improper material selection of the engines, fuel delivery system, turbo charging systems, including turbochargers and associated system components, as well as engine accessories;

g.    improper quality control for the engines, fuel delivery system, turbo charging systems, including turbochargers and associated system components, as well as engine accessories;

h.    improper continuing airworthiness instructions concerning the engines, fuel delivery system, turbo charging systems, including turbochargers and associated system components, as well as engine accessories;

i.    improper size and dimensions of the engines, fuel delivery system, turbo charging systems, including turbochargers and associated system components, as well as engine accessories;

j.    the engine components, particularly the turbo charging systems and fuel delivery systems were not able to endure normal operating conditions without failure;

k.    the turbo system and components did not have adequate safeguards against failure;

l.    non-conformance of the engines, fuel delivery system, turbo charging systems, including turbochargers and associated system components, as well as engine accessories; and

m.    lack of any measures taken to correct these known defects.

128.    As a direct result of these breaches of warranties, failures, non-conformance, and design defects, the accident aircraft suffered an engine's turbo system failed and caused a power

loss and was unreasonably dangerous, defective and did cause Plaintiffs' injuries and damages, and the death of Plaintiffs' decedent.

WHEREFORE, Plaintiffs demand judgment against Defendants, jointly and severally, for compensatory and punitive damages plus pre and post judgment interest, costs, attorney's fees and such other relief as the Court deems appropriate.

## COUNT IV
### (NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS)
### *Plaintiffs HANNAH BOCKER AND SARAH BOCKER v.*
### *Defendants Continental Motors and Hartzell Engine Technologies*

129.    Plaintiffs incorporate by reference the above paragraphs as though set forth at length herein.

130.    Each Defendant owed a duty to Plaintiffs, as described above.

131.    Each Defendant's breach of duty proximately caused the accident and was a proximate cause of the emotional distress that naturally resulted to Plaintiffs as a result of each Defendants' act.

132.    The Plaintiffs were inside the residence which the accident aircraft impacted when it crashed and therefore experienced and observed the accident sequence and ensuing fire, and were within the zone of danger of the accident, and witnessed the injury to and eventual death of their father, GERARD BOCKER.

133.    The impact and ensuing fire left no doubt in Plaintiffs' mind that they would be injured or worse, perish in the conflagration.

134.    After the aircraft impacted the house, Plaintiffs had to wait for emergency personnel to locate and rescue them – all the while they were suffering the injuries explained above.

135.    As a direct and proximate result of Defendants' negligence and/or defective products, Plaintiffs suffered and continue to suffer emotional and physical injuries which were a direct result of the accident and were foreseeable to Defendants.

136.    Plaintiffs suffered the aforementioned injuries and damages as a direct result from the sensory and contemporaneous observance of the accident and fear of the impending death by mutilation and serious bodily injury.

WHEREFORE, Plaintiffs demand judgment against Defendants, jointly and severally, for compensatory and punitive damages plus pre and post judgment interest, costs, attorney's fees and such other relief as the Court deems appropriate.

**COUNT IV**
**(WRONGFUL DEATH)**
***Plaintiffs v. All Defendants***

137.    Plaintiffs incorporate by reference the above paragraphs as though set forth at length herein.

138.    Plaintiffs bring this Count pursuant to Delaware's Wrongful Death Statute 10 Del. C. § 3721, et seq. to recover an amount that will fairly compensate them for the injury resulting from the death of Plaintiffs' Decedent. To the extent Delaware law does not apply, Plaintiffs bring wrongful death claims and seek wrongful death damages to fullest extent permitted by the law deemed to apply to this case.

139.    Plaintiffs bring this claim on behalf of themselves and all person entitled to recover damages for the wrongful death of the Decedent pursuant to 10 Del. C. § 3724 or any other applicable law.

140.    As a result of the death of Decedent, Plaintiffs and others entitled to recovery under 10 Del. C. § 3724 or any other applicable law were, *inter alia*, deprived of the expectation of

pecuniary benefits that would have resulted from Decedent's life, suffered mental anguish, mental pain and suffering, loss of contribution for support, loss of household services, loss of society, loss of consortium, companionship, comfort, protection, attention, advice, counsel and guidance, which will persist for the rest of their lives.

141.    As a direct and proximate result of the aforesaid negligence of the Defendants, Plaintiffs have incurred funeral expenses in connection with the death of Decedent.

WHEREFORE, Plaintiffs demand judgment against Defendants, jointly and severally, for all damages recoverable under the Wrongful Death Statute or other applicable law plus pre and post judgment interest, costs, attorney's fees and such other relief as the Court deems appropriate.

## COUNT V

### (SURVIVAL ACTION)

### *Plaintiffs v. All Defendants*

142.    Plaintiffs incorporate paragraphs 1 through 143 as though set forth at length herein.

143.    Plaintiffs bring this Count pursuant to Delaware Survival Statute 10 Del. C. § 3701, *et seq.*

144.    By reason of the negligence of the Defendants, which resulted in the injuries to Decedent, Plaintiffs claim damages for the physical and emotional suffering endured by the Decedent prior to his death.  To the extent Delaware law does not apply, Plaintiffs bring survival claims and seek survival damages to fullest extent permitted by the law deemed to apply to this case.

WHEREFORE, Plaintiffs demand judgment against Defendants, jointly and severally, for all damages recoverable under the Survival Statute plus pre and post judgment interest, costs, attorneys' fees and such other relief as the Court deems appropriate.

## **JURY TRIAL DEMANDED**

Plaintiffs hereby demand a jury for all issues so triable.

WHEREFORE, Plaintiffs demand all the relief set forth above and such other relief as the

Court deems just and proper.


Dated: August 12, 2021                          Respectfully submitted,

                                                **FARNAN LLP**

                                                /s/ Michael J. Farnan
*Of Counsel:*                                   Joseph J. Farnan, III (#3945)
Michael S. Miska                                Brian E. Farnan (#4089)
Cynthia M. Devers                               Michael J. Farnan (#5165)
The Wolk Law Firm                               919 N. Market St., 12th Floor
1710-12 Locust Street                           Wilmington, DE 19801
Philadelphia, PA  19103                         (302) 777-0300

                                                *Attorneys for Plaintiffs*