# EXHIBIT A

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF DUTCHESS**

-----------------------------------------------------------X
HANNAH BOCKER, SARAH BOCKER and
BARBARA BOCKER as Administrator of the Estate of
GERARD BOCKER and BARBARA BOCKER
Individually,

**Plaintiffs,**                                    **SUMMONS**

-against-

Index No.:
Date Index No.
purchased:

HERGIN AVIATION INC., KNIPPING-DIAZ and
ASSOCIATES INC., CESSNA AIRCRAFT
CORPORATION d/b/a n/k/a TEXTRON AVIATION,
INC., HARTZELL ENGINE COMPONENTS, INC. /
HARTZELL ENGINE TECHNOLOGIES,
CONTINENTAL AEROSPACE TECHNOLOGIES,
INC. f/k/a CONTINENTAL MOTORS, INC.,
SOUTH TEC AVIATION LLC
BERKSHIRE AVIATION ENTERPRISES, INC.,
BERKSHIRE AVIATION HOLDINGS, INC.
BERKSHIRE AVIATION ENTERPRISES, LLC, PINE
MOUNTAIN AVIATION, LLC, and JOHN DOES 1-
10,

**Defendants.**
-----------------------------------------------------------X

To the above-named Defendants:

**YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve
a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of
appearance, on the Plaintiff's attorney within 20 days after the service of this summons (exclusive
of the day of service), or within 30 days after the service is complete if this summons is not
personally delivered to you within the State of New York.

**YOU ARE HEREBY NOTIFIED THAT** should you fail to appear or answer, a judgment
will be entered against you by default for the relief demanded in the complaint.

The Plaintiffs' designate Dutchess County as the place of trial.

The basis of venue is Plaintiff's residence and situs of the tort.

DATED:           August 11, 2021
                       Eastchester, New York

                                 /s/      *Michael Miska*

                                 Michael Miska, Esq.
                                 The Wolk Law Firm
                                 Attorneys for Plaintiffs, Hannah Bocker,
                                 Sarah Bocker and
                                 Barbara Bocker, As Administrator of the
                                 Estate of Gerard Bocker and Individually
                                 1710-12 Locust Street
                                 Philadelphia, PA 19103

                                 Co-counsel Thomas G. Cascione
                                 Co-Attorney(s) for Plaintiffs Hannah &
                                 Barabara Bocker as Administrator of the
                                 Estate of Gerard Bocker and Individually
                                 Cascione Purcigliotti and Galluzzi P.C.
                                 274 White Plains Road, 2nd Floor, Suite 6
                                 Eastchester, NY 10709-4419
                                 Telephone No.: (914) 961-1263

Defendants Addresses:

HERGIN AVIATION INC.
30 Airway Drive, Suite 1
LaGrangeville, NY 12540

KNIPPING-DIAZ and ASSOCIATES INC.
327 Audubon Avenue
New York, NY 10033

CESSNA AIRCRAFT CORPORATION d/b/a n/k/a TEXTRON AVIATION, INC.
One Cessna Boulevard
Wichita, KS 67215

HARTZELL ENGINE COMPONENTS, INC.
HARTZELL ENGINE TECHNOLOGIES
2900 Selma Highway
Montgomery, AL 36108

CONTINENTAL AEROSPACE TECHNOLOGIES, INC. f/k/a CONTINENTAL MOTORS, INC.
2039 S. Broad Street

2

Mobile, AL  36615

SOUTH TECAVIATION LLC
3330 Airport Loop
Salisbury, NC  28147

BERKSHIRE AVIATION ENTERPRISES, INC. and BERKSHIRE AVIATION HOLDINGS,
INC.
70 Egremont Plain Road
Great Barrington, MA 01230

BERKSHIRE AVIATION ENTERPRISES, LLC
North Egremont Plain Road
Great Barrington, MA  01230

PINE MOUNTAIN AVIATION, LLC
37 Carriage House Drive
Danbury, CT  06810

3

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF DUTCHESS

---------------------------------------------------------X

HANNAH BOCKER, SARAH BOCKER and
BARBARA BOCKER as Administrator of
the Estate of GERARD BOCKER and
BARBARA BOCKER, Individually,

     Plaintiffs;

     v.

HERGIN AVIATION INC., KNIPPING-
DIAZ and ASSOCIATES INC.,  CESSNA
AIRCRAFT CORPORATION d/b/a n/k/a
TEXTRON AVIATION, INC.,  HARTZELL
ENGINE COMPONENTS, INC. /
HARTZELL ENGINE TECHNOLOGIES,
CONTINENTAL AEROSPACE
TECHNOLOGIES, INC. f/k/a
CONTINENTAL MOTORS, INC.,
SOUTHTECAVIATION LLC
BERKSHIRE AVIATION ENTERPRISES,
INC., BERKSHIRE AVIATION
HOLDINGS, INC. BERKSHIRE AVIATION
ENTERPRISES, LLC, PINE MOUNTAIN
AVIATION, LLC, and JOHN DOES 1-10,

     Defendants.

---------------------------------------------------------X

Index No.

Date Purchased:

**VERIFIED COMPLAINT**

## CIVIL ACTION COMPLAINT

     Plaintiffs, by their attorneys, The Wolk Law Firm and Cascione, Purcigliotti & Galluzzi,

P.C., complaining of the Defendants, respectfully allege upon information and belief:

## THE PARTIES

     1.    At all times herein mentioned, Plaintiff HANNAH BOCKER was and still is a

resident of the County of Dutchess, State of New York, and currently resides at 66 Trillium Road,

Pleasant Valley, NY  12569.

4

2. At all times herein mentioned, Plaintiff BARBARA BOCKER was and still is a resident of the County of Dutchess, State of New York, and currently resides at 66 Trillium Road, Pleasant Valley, NY 12569.

3. On June 29, 2020 BARBARA BOCKER was appointed by the Dutchess County Surrogate as Administrator of the Estate of GERARD BOCKER and was the wife of GERARD BOCKER at the time of his death.

4. At all times herein mentioned, Plaintiff SARAH BOCKER was and still is a resident of the County of Dutchess, State of New York, and currently resides at 66 Trillium Road, Pleasant Valley, NY 12569.

5. Plaintiffs HANNAH BOCKER and SARAH BOCKER are each natural daughters of Plaintiff BARBARA BOCKER and GERARD BOCKER, deceased. Also surviving GERARD BOCKER is his natural son, WILLIAM BOCKER.

6. At all times material hereto, Defendant CESSNA AIRCRAFT CORPORATION d/b/a n/k/a TEXTRON AVIATION, INC. (collectively "Cessna") is a Kansas corporation and maintains a principal place of business at One Cessna Boulevard, Wichita, Kansas 67215.

7. Defendant CONTINENTAL MOTORS, INC. n/k/A CONTINENTAL AERO CONTINENTAL AEROSPACE TECHNOLOGIES, INC. ("Continental") is a Delaware corporation and maintains a principal place of business at 2039 S. Broad Street, Mobile, Alabama 36615.

8. Defendant HARTZELL ENGINE TECNOLOGIES LLC ("Hartzell") is a Delaware corporation and maintains a principal place of business at 2900 Selma Highway, Montgomery, Alabama 36108.

9. Defendant SOUTHTECAVIATION LLC a/k/a SouthTecAviation a/k/a South Tec Aviation ("SouthTec") is a North Carolina corporation and maintains a principal place of business at 3330 Airport Loop, Salisbury, North Carolina 28147 and a registered address at 168F Norman Station Boulevard, Mooresville, North Carolina 28117.

10. Defendants BERKSHIRE AVIATION ENTERPRISES, INC., BERKSHIRE AVIATION HOLDINGS, INC., AND BERKSHIRE AVIATION ENTERPRISES, LLC (collectively "Berkshire") are Massachusetts corporations and maintain a principal places of business at 70 Egremont Plain Road, Great Barrington, Massachusetts 01230; and North Egremont Plain Road, Great Barrington, Massachusetts 01230.

11. Defendant PINE MOUNTAIN AVIATION LLC ("Pine Mountain") is a Connecticut corporation and maintains a principal place of business at 37 Carriage House Drive, Danbury, Connecticut 06810.

12. That on August 17, 2019, and at all times herein mentioned, Defendant KNIPPING-DIAZ and ASSOCIATES INC. was and still is a domestic New York corporation, and was the employer of the aircraft's pilot, Francisco Knipping-Diaz, who also owned the aircraft through Pegasus Aviation, Inc.

13. That on August 17, 2019, and at all times herein mentioned, Defendant HERGIN AVIATION INC., was, and still is, a domestic New York corporation, operating at the location of SKY ACRES ENTERPRISES INC., who managed an airport in Lagrangeville, New York known as Sky Acres Airport.

14. Defendant HERGIN AVIATION INC. was authorized to sell aviation fuel at the airport in Lagrangeville, New York known as Sky Acres Airport and that on August 17, 2019 and all times herein mentioned, FRANCISCO KNIPPING-DIAZ was provided fuel for the Cessna

model T303 airplane bearing registration number N303TL at Sky Acres by defendant HERGIN AVIATION INC.

15. That at all times hereinafter mentioned defendant KNIPPING-DIAZ and ASSOCIATES INC., was a closely held corporation formed in order to conduct the business of the law practice of FRANCISCO KNIPPING-DIAZ.

16. That JOHN DOES 1-10 are individuals who serviced, inspected, repaired, maintained, modified or overhauled the aforementioned Cessna model T303 airplane bearing registration number N303TL on or before August 17, 2019, true identities unknown.

17. That on August 17, 2019 and all times herein mentioned the residence of the Plaintiffs was located at 235 South Smith Road, Union Vale, New York was in the known flight path of Sky Acres Airport.

## JURISDICTION AND VENUE

18. The venue of this case is proper because it was the situs of the torts and injuries and is the residence County of all plaintiffs named above. Furthermore it is anticipated that a motion will be made to join this matter for discovery with the related actions currently joined under *Bocker v. Knipping et al*, Dutchess County Index No. 55313-2019.

19. At all times mentioned herein, Defendants, and each of them, were the agents, servants, and/or employees of the remaining Co-Defendants. All Defendants were either joint tortfeasors or otherwise secondarily liable for said acts and omissions of all other Defendants.

20. Defendants, and each of them, caused parts and services to be sold, installed, and distributed in the State of New York, which is the subject of this Complaint.

21. Each of the Defendants did support these components in this County, interact with the other Defendants in this county, and sold parts and services to this county.

7

22.     The amount in question is greater than the jurisdictional amount required by this Court.

23.     Thus, Jurisdiction and venue are appropriate in this Court.

**FACTUAL BACKGROUND**

24.     This matter arises from the August 17, 2019 crash of a Cessna T303 aircraft, bearing registration number N303TL, in Lagrangeville, New York.

25.     This aircraft is equipped with two turbocharged piston engines, manufactured by defendant Continental Motors.

26.     The aircraft was piloted by Francisco Knipping-Diaz, who sustained fatal injuries in the crash.

27.     Also on board were Teófilo Antonio Diaz and Eduardo Tio as passengers, who survived the crash.

28.     The accident aircraft had landed at Sky Acres Airport (44N) in Lagrangeville, New York, where it received fuel before takeoff, following a business meeting at Orange County Airport (MGJ) in Montgomery, New York.

29.     After receiving fuel, the pilot started the engines of the accident aircraft, and departed Sky Acres Airport in day visual meteorological conditions, with a destination of Republic Airport (KFRG) in Farmingdale, New York.

30.     The pilot then departed the airport on Runway 17 at Sky Acres.

31.     Shortly after takeoff the aircraft lost engine power at a low altitude, and was unable to climb.

32.     The aircraft began to drift left, and the pilot attempted to straighten its course, continuing over the end of the runway and approached obstacles.

8

33.     Ultimately the plane was unable to climb due to the power loss, rolled left and impacted the Bocker residence, trees and the ground.

34.     Inside the Bocker residence was Hannah Bocker, her father Gerard Bocker, and sister Sarah Bocker.

35.     The aircraft almost immediately burst into flames as did the Bockers' house.

36.     In fact, Hannah Bocker, Gerard Bocker, and Sarah Bocker were inside, and witnessed the conflagration which ensued.

37.     Sadly, Gerard Bocker was consumed by the fire and perished.

38.     Hannah Bocker was severely burned all over her body due to the fire, inhaling smoke and sustaining internal and external thermal injuries.

39.     Sarah Bocker, was able to egress from a window of the house, suffering injuries and witnessing the horrors which befell her family.

### BACKGROUND OF THE ACCIDENT AIRCRAFT AND ITS ENGINES

40.     The accident Cessna T303 "Crusader" is pictured, below:



41.     The aircraft has a cabin which seats four passengers, with room for a pilot and an additional crew member or passenger in the front.

42.     It is equipped with Continental two (L)TSIO-520-AE3B piston engines each rated at 250 HP, which were counter-rotating and turbocharged.

9

43. The purpose of turbocharging an engine is to increase its performance at higher altitudes, as the air thins and becomes less dense, so that the fuel/air mixture can remain at or close to that at sea-level.

44. In the event that a turbocharger malfunctions or seizes, then the engine will not receive an appropriate fuel/air mixture and cause a loss of power.

45. The turbochargers in the accident aircraft are the responsibility of the Hartzell defendants. Upon information and belief, AiResearch, Inc., was purchased by and merged with and/or changed its name to Garrett AiResearch Corp. Garrett AiResearch Corp. was subsequently purchased by and merged with and/or changed its name to Garrett Corp. Garrett Corp. was purchased by and merged into Signal Oil & Gas Co. in 1964. Signal Oil & Gas Co. changed its name to Signal Companies, Inc. in 1968. Signal Companies, Inc. merged with Allied Corp. to form Allied-Signal Inc. in 1985. AlliedSignal Inc. changed its name to Honeywell International, Inc., in 1999. Subsequent to that sale and merger, the turbocharger's product line holder became Kelly Aerospace, and then transferred to the Hartzell defendants at all times material hereto.

46. AiResearch, Inc., Garrett AiResearch Corp., Garrett Corp., Signal Oil & Gas Co., Signal Companies, Inc., Allied-Signal Inc., and AlliedSignal, Inc. no longer have any corporate existence, and have had all of their assets, product lines, liabilities, good will, trade names, patents, employees and accounts receivable have transferred to the Hartzell defendants, who assumed all liabilities of these companies.

47. Upon information and belief, Hartzell is the successor in interest for the turbocharging components aboard the accident aircraft.

48. The Cessna Crusader, is further notorious for its difficult handling conditions, particularly when a power loss occurs.

10

49.     In the event of single engine operation due to a power loss in one engine, rudder trim is inadequate to overcome the adverse yaw of one engine.

50.     The Crusader further has a low climb rate, which becomes negligible in the event of a loss of power.

51.     Furthermore, in the event that a power loss occurs on takeoff, the Crusader has a very long accelerate/stop distance, giving a pilot the inability to try and accelerate to takeoff and then stop on the runway such as at Sky Acres, in the event of an emergency.

52.     Worse yet, the single engine climb rate of the Crusader is negative until the gear are raised with a windmilling prop, and increases further if the propeller is not feathered, leaving no margin of safety in in the design of the aircraft in the event of a power loss.

53.     In addition to the performance issues, the aircraft's fuel sumps were not able to adequately drain any water which entered the fuel tanks, whether through the introduction of fuel, or through leaks in the fuel caps.

54.     In fact, the fuel system of the T303 has been plagued with fuel delivery issues from its inception, requiring numerous service bulletins in an attempt to remedy its inability to deliver a proper amount of fuel to the engines.

55.     In normal operation, T303 Crusaders have a history of engine power losses due to fuel delivery malfunctions and malfunctions of turbochargers.

56.     In the event of a turbocharger malfunction, a power loss is imminent, which is particularly dangerous on takeoff.

11

## ACCIDENT INVESTIGAION

57.     Post-crash investigation confirmed the witness statements that the aircraft suffered a loss of power, resulting in its failure to climb, and inability for the pilot to maintain directional control.

58.     This loss of power occurred unexpectedly, just after the aircraft took off from the airport.

59.     The pilot of the aircraft, Francisco Knipping-Diaz, was not able to climb in the aircraft following this power loss.

60.     As such, the pilot made a forced landing on the Bocker residence, and the aircraft and the house immediately caught fire.

61.     Plaintiffs Hannah Bocker, Sarah Bocker and their father, Gerard Bocker, deceased, were inside the residence at the time.

62.     Post-crash investigation of the accident aircraft confirm that it was not capable of making sufficient power to remain airborne.

63.     If the fuel system of the aircraft does not provide sufficient fuel, and fuel free of contaminants, the engines are unable to make rated power.

64.     Further, investigation reveals that the aircraft's turbocharger wastegates were in vastly different positions, with the left wastegate nearly closed, confirming that the engine was demanding additional boost due to issues with its induction system.

65.     In fact, in the event of a turbocharger seizure or induction blockage, the wastegate on an engine will attempt to raise the manifold pressure, just as was found post-accident on the subject left engine.

12

66. If the fuel/air mixture provided to the engine is not appropriate, it will further be unable to make rated power.

67. Furthermore, the signatures in the propellers and control levers confirm that the aircraft was not making rated power on takeoff.

68. Additionally, passenger and witness statements confirm the fact the accident aircraft suffered a powerplant power loss and was unable to climb and be controlled as a result.

69. Due to the design characteristics of the T303, above, the loss of power resulted in the inability of the aircraft to climb at a positive rate.

70. Moreover, the aircraft had just received fuel prior to departure.

71. Due to the design of the fuel system, and contaminants were not sufficiently removed, this further contributed to the engines' inability to make rated power and take off successfully.

72. The accident aircraft and its engines received an annual inspection by the SouthTec defendants on or about July 17, 2019, who signed off on the aircraft as airworthy and safe to fly, as evidenced by the logbook entries which accompanied the service performed.

73. Prior to that inspection, the Berkshire Aviation defendants performed inspections on the accident aircraft, similarly signing off on it as airworthy.

74. In fact, the Berkshire Aviation defendants also installed an overhauled and inspected left engine in the accident aircraft following a runway incident and sudden stoppage inspection.

75. The left engine was inspected and repaired by defendant Pine Mountain Aviation, who replaced numerous components during that work, including new cylinder assemblies by

Continental Motors, newly overhauled magnetos, and other components necessary for the engine to run properly.

76. Pine Mountain Aviation then shipped the engine to defendant Berkshire for installation on the accident aircraft following repair and overhaul.

77. The aircraft and its engines were equipped with turbo components manufactured by the Hartzell defendants, which did malfunction and cause and contribute to the power loss experienced on board the aircraft on the day of the accident.

78. These engine assemblies were selected by the Continental and Cessna defendants.

79. Moreover, the Cessna defendants designed and certified the accident model aircraft.

**DAMAGES**

80. Plaintiff HANNAH BOCKER was 21 years old at the time of the accident.

81. HANNAH BOCKER was in her family home when the accident aircraft impacted it, causing it to ignite and catch fire.

82. HANNAH BOCKER suffered severe burns all over her body, smoke inhalation, fear of impending death, and jumped out of the home suffering physical injuries to avoid further injury and death due to this crash.

83. Plaintiff HANNAH BOCKER has undergone numerous surgeries and continues to receive treatment for the injuries, disfigurement, pain and suffering she has endured due to this accident.

84. Plaintiff SARAH BOCKER was 29 years old at the time of the accident.

85. SARAH BOCKER was also in the home when the aircraft impacted it, and was forced to exit through a window, witnessing the accident, fire and injuries to her sister and father.

14

86. Plaintiffs' decedent GERARD BOCKER was 61 years old at the time of the accident.

87. GERARD BOCKER was in his home at the time the accident aircraft impacted it and caused it to ignite.

88. GERARD BOCKER perished after the impact due to smoke inhalation and thermal injuries.

89. Before Plaintiff's decedent GERARD BOCKER was killed on September 17, 2019, he was caused to experience excruciating conscious pain and suffering as well as fear of impending death.

90. GERARD BOCKER is survived by his wife, BARBARA BOCKER, and children, HANNAH BOCKER, SARAH BOCKER, and WILLIAM BOCKER, who have lost his love, care, affection, guidance, tutelage, consortium, and support.

91. Plaintiffs bring this action against Defendants seeking damages for their injuries, losses and for the death of GERARD BOCKER. Plaintiffs seek recovery of damages to which Plaintiffs are entitled, including, but not limited to, damages pursuant to the applicable wrongful death and survival statutes, damages for personal injuries, loss of earnings, loss of net accumulations, loss of inheritance, emotional and physical pain and suffering, loss of comfort, care, companionship, past and future medical care and expenses together with damages for pre-crash and post-crash physical pain and suffering, emotional anguish, terror and fright, and negligent infliction of emotional distress.

92. Plaintiff HANNAH BOCKER seeks damages for her ongoing injuries, damages, and future pain and suffering which she has as a direct result of the subject accident.

15

93.     Further, Plaintiffs seek punitive damages, to the extent available, for the conduct of the Defendants that caused their injuries and Damages.

94.     Further, on August 17, 2019 and all times herein mentioned BARBARA BOCKER was a fee simple owner of the property and premises at 235 South Smith Road, Union Vale NY.

95.     That in the abovementioned airplane crash of August 17, 2019 the house which had been plaintiffs' home at 235 South Smith Road, Union Vale NY was burned beyond repair and most of its contents destroyed.

96.     That due to the negligent, careless and reckless acts of the defendants, Plaintiff BARBARA BOCKER lost the use and value of her home as well as her personal property and family heirlooms and became liable for a costly demolition and remediation.

97.     Plaintiff BARBARA BOCKER maintains this claim for all members of her family as the title ownership of many of the items of personal property lost in the crash and fire were jointly within the family.

98.     That by reason of the foregoing, BARBARA BOCKER assets a claim and has been damaged in a sum exceeding the jurisdictional limits of all lower courts which would otherwise have jurisdiction.

### COUNT I
#### (STRICT LIABILITY)
#### *Plaintiffs v. Defendant Cessna Aircraft, Inc.*

99.     Plaintiffs incorporate the above paragraphs as though set forth at length herein.

100.    The Cessna defendants are in the business of designing, manufacturing, testing, certifying, distributing, selling, supplying and/or providing aircraft and aircraft component parts.

16

101.    In fact, the Cessna defendants did originally design, manufacture, sell and distribute the accident aircraft, replacement parts, and are at all times material hereto the Type Certificate Holder for the accident model aircraft.

102.    The Cessna defendants designed, manufactured, tested, certified, distributed, sold, supplied and/or provided the defective and unreasonably dangerous accident aircraft and its component parts including the engines which it selected for use, the fuel system, the turbocharging system, and further designed and specified the performance characteristics for the accident aircraft.

103.    In addition, the Cessna defendants specified the emergency procedures, preflight procedures, maintenance manuals and guides, and provided instructions for continued airworthiness for the accident aircraft.

104.    The dangerous defects which caused this accident existed at the time the accident aircraft and its component parts were first sold, in that:

   a.   The defects in the aircraft engine, propeller, and fuel delivery system existed at the time these components were designed and sold by the defendants; and

   b.   The defects existed at the time the defendants distributed these components;

   c.   The defendant failed to warn of these defects; and

   d.   The defendant failed to provide adequate instruction for continued airworthiness and failed to provide engine troubleshooting information describing probable engine and fuel delivery malfunctions, engine and turbocharging system malfunctions, how to recognize these malfunctions, and the remedial actions for these malfunctions.

105.    The accident aircraft and its component parts were in substantially the same condition at the time of the accident as when first sold.

17

106.    At all times material, the aircraft's engines, turbocharging components and engines and fuel related components were defective, resulting in an unreasonably dangerous condition which was a substantial factor and proximate cause in the crash of the subject aircraft.

107.    The defects which rendered the aircraft unreasonably dangerous and defective were, but are not limited to, the following:

a.   Defective and unreasonably dangerous fuel delivery system;

b.   Defective and unreasonably dangerous engines;

c.   Defective and unreasonably dangerous and complex maintenance and inspection instructions;

d.   Defective and unreasonably dangerous aircraft design;

e.   Defective and unreasonably dangerous aircraft single engine performance;

f.    Defective and unreasonably dangerous turbocharging system;

g.   inadequate materials used in construction;

h.   inadequate testing of all engine components;

i.   inadequate instructions to cope with loss of power;

j.   inadequate design and construction of the engine to minimize the development of an unsafe condition between overhaul periods;

k.   defective and inadequate instructions, warnings and information regarding the operation of the aircraft engine and its systems, components, accessories, and hardware;

l.   defective and inadequate warnings concerning failures of the aircraft engine and its systems, components, accessories, and hardware;

18

m.  defective instructions for continued airworthiness in that they failed to provide engine troubleshooting information describing probable engine malfunctions, how to recognize those malfunctions, and the remedial action for those malfunctions;

n.  defective reporting of failures, malfunctions and defects in the engine products, parts, processes or articles that it has manufactured;

o.  dangerous and defective systems, assemblies, components, parts and systems of the engine installed on the accident aircraft;

p.  dangerous, defective and deficient engine, engine assemblies, components and systems, all of which failed to provide useful power to the aircraft and pilot;

q.  Failing to warn of the defects in the design, development and manufacture of the aircraft and engines;

r.  Failing to warn of the lack of airworthiness and continued airworthiness of the aircraft, engines, fuel system, and turbocharging system;

s.  Designing, manufacturing and selling aircraft, engines, fuel system, and turbocharging system, which was not properly tested during certification or at any time thereafter;

t.  Certifying the aircraft without properly testing the flight characteristics of the accident aircraft;

u.  Defective and inadequate warnings concerning prior engine power loss situations and loss of control;

v.  Failure to design an aircraft with adequate yaw control to overcome the adverse effects of a propeller at low or no power settings;

19

w. Failure to adequately warn of the aircraft's defects;

x. Failure to properly test and design the aircraft, including its critical V speeds;

y. Failure to incorporate an adequate factor of safety into the design of the aircraft; and

z. Other defects which will be proven at trial.

108. The accident aircraft, engines, turbo systems, fuel delivery system components and accessories, were placed into the stream of commerce when it was originally sold by these defendants.

109. At the time of the sale and at all times thereafter, the accident engines, turbo systems, fuel delivery system components and accessories were in a defective, unairworthy and unreasonably dangerous condition with manufacturing and/or design defects as aforesaid that were hidden and not obvious to the foreseeable users of the engines.

110. As a result of these defects, the accident aircraft suffered a power loss on takeoff, directly and proximately causing this crash and Plaintiffs' damages, described above.

WHEREFORE, Plaintiffs demand judgment against these defendants for all damages permitted by law, costs and interest as may be allowed by law, and requests trial by jury of all issues triable as a right by a jury.

### Count II
### (NEGLIGENCE)
### *Plaintiffs v. Defendant Cessna Aircraft, Inc.*

111. Plaintiffs incorporate the above paragraphs as though set forth at length herein.

112. Defendants owed duties to the plaintiffs and their actions and omissions detailed above and here resulted in the accident aircraft losing power, unable to climb, and as a result the accident airplane to crashed, causing plaintiffs' damages.

20

113. The defendants' actions and omissions included but are not limited to:

a. Failure to provide a properly designed fuel delivery system;

b. Failure to provide and select suitable engines for use in the accident aircraft;

c. Failure to provide a proper and suitable maintenance and inspection instructions which would prevent against the development of dangerous conditions;

d. Failure to provide a properly designed and performing aircraft;

e. Failure to provide an aircraft with adequate single engine performance;

f. Failure to properly certify the aircraft, particularly in single engine or engine out scenarios;

g. Failure to provide a properly designed turbocharging system;

h. Failure to utilize adequate materials used in construction;

i. Failure to adequately test all engine components;

j. Failure to provide adequate instructions to cope with loss of power;

k. Failure to adequately design and construct the engine to minimize the development of an unsafe condition between overhaul periods;

l. Failure to provide sufficient instructions, warnings and information regarding the operation of the aircraft engine and its systems, components, accessories, and hardware;

m. Failure to provide sufficient and suitable warnings concerning failures of the aircraft engine and its systems, components, accessories, and hardware;

n. Failure to provide adequate and appropriate instructions for continued airworthiness, as they failed to provide engine troubleshooting information describing

21

probable engine malfunctions, how to recognize those malfunctions, and the remedial action for those malfunctions;

o.      Failure to report of failures, malfunctions and defects in the aircraft and engine;

p.      Provision of dangerous and defective systems, assemblies, components, parts and systems of the engine installed on the accident aircraft;

q.      Provision of dangerous, defective and deficient engine, engine assemblies, components and systems, all of which failed to provide useful power to the aircraft and pilot;

r.      Failure to warn of the defects in the design, development and manufacture of the aircraft, fuel system and engines;

s.      Failure to warn of the lack of airworthiness and continued airworthiness of the aircraft, engines, fuel system, and turbocharging system;

t.      Designing, manufacturing and selling aircraft, engines, fuel system, and turbocharging system, which was not properly tested during certification or at any time thereafter;

u.      Certifying the aircraft without properly testing the flight characteristics of the accident aircraft;

v.      Defective and inadequate warnings concerning prior engine power loss situations and loss of control;

w.      Failure to design an aircraft with adequate yaw control to overcome the adverse effects of a propeller at low or no power settings;

x.      Failure to adequately warn of the aircraft's defects;

22

y.    Failure to properly test and design the aircraft, including its critical V speeds;

z.    Failure to incorporate an adequate factor of safety into the design of the aircraft; and

aa.    Other defects which will be proven at trial.

114.    The Defendant willfully, recklessly, or negligently misled or concealed information Plaintiffs and the flying public in that they did report prior instances of engine or engine systems failures, malfunctions or defects.

115.    Defendant further negligently misrepresented the dangerous defects and flaws in the aircraft's design and performance, as detailed herein.

116.    As a direct and/or proximate result of the foregoing actions and omissions, the accident aircraft crashed causing Plaintiffs' injuries and damages and the death of Plaintiffs' decedent.

117.    As a direct and proximate result of the Defendants' negligence and/or defective products, the Plaintiffs have suffered, and continue to suffer emotional injuries which were a direct result of the accident and foreseeable to the Defendants.

118.    Plaintiffs suffered the aforementioned injuries and damages as a direct result from the sensory and contemporaneous observance of the accident and of the injuries to one another and make a claim for negligent infliction of emotional distress.

WHEREFORE, Plaintiffs demand judgment against these defendants for all damages permitted by law, costs and interest as may be allowed by law, and requests trial by jury of all issues triable as a right by a jury.

23

## Count III
### (BREACH OF EXPRESS AND IMPLIED WARRANTIES)
### *Plaintiffs v. Defendant Cessna Aircraft, Inc.*

119.    Plaintiffs incorporate the above paragraphs as though set forth at length herein.

120.    The Cessna Defendants, acting individually and collectively and as agent and joint ventures or with the other defendants, were sellers of the aircraft as well as components installed in the accident aircraft, its fuel system, engines, accessories and its other systems, components or assemblies.

121.    Defendants are now, and was at all times material, merchants engaged in the business of designing, manufacturing, marketing and/or selling aircraft engines and component parts, including the accident aircraft, its engines, turbochargers, fuel system and its component and replacement parts.

122.    Defendants described and represented that engines, including the engines utilized by the accident aircraft, fuel system, engines and component parts, turbochargers and associated materials, as for sale and for use in various ways, including, but not limited to, descriptions and representations found in/on the internet, advertising brochures, operating instructions, maintenance and overhaul manuals, and product support and service publications.

123.    The Defendants, and each of them, warranted that the fuel system, engines and turbochargers, among the other systems, would be designed, supplied and constructed to operate safely throughout the complete operating range of the engine under all flight and atmospheric conditions and between overhaul periods.

124.    These descriptions, representations, and affirmations resulted in oral and written express warranties in regard to engine utilized on the accident aircraft.

24

INDEX NO. 2021-53475
RECEIVED NYSCEF: 08/12/2021

125.    The Defendants breached express and implied warranties because the aircraft suffered a power loss just after takeoff, which did cause Plaintiffs' injuries and damages.

126.    These breaches of express and implied warranties included the following:

a.    Not designing and constructing the engines to function safely throughout its operating range and between overhaul periods safely;

b.    Not designing and certifying an aircraft with suitable engine out or single engine handling characteristics;

c.    Failing to select appropriate power plants, including the  engines and turbochargers;

d.    Failing to design and construct a safe and functional fuel system;

e.    Failing to provide a safe and airworthy aircraft, engine, turbocharger and fuel system;

f.    Not performing a proper safety analysis of these components; and

g.    Failing to warn pilots, maintenance facilities, operators and the public of the propensity this type of an engine failure.

127.    As a result of the breach of warranties by the Defendants, and each of them, the aircraft engine or its systems malfunctioned and the aircraft crashed, causing Plaintiffs' injuries and damages and killing Plaintiffs' decedent, as described above.

WHEREFORE, Plaintiffs demand judgment against these defendants for all damages permitted by law, costs and interest as may be allowed by law, and requests trial by jury of all issues triable as a right by a jury.

## Count IV
### (STRICT LIABILITY)
### *Plaintiffs v. Defendants Continental Motors and Hartzell Engine Technologies*

128. Plaintiffs incorporate the above paragraphs as though set forth at length herein.

129. The Continental and Hartzell defendants are in the business of designing, manufacturing, testing, certifying, distributing, selling, supplying and/or providing aircraft engines and component parts, including turbochargers and related components.

130. Further, these defendants are in the business of designing, inspecting, testing, distributing, selling, supplying, rebuilding, servicing, supporting, marketing, aircraft engines as well as aftermarket and OEM parts, in particular turbo charging systems, including turbochargers, waste gates, turbo controllers, check and oil return valves and associated system components and are the parts manufacturer authorization, technical standard order, supplemental type certificate holder, type certificate holder, and/or production certificate holder responsible to ensure the continuing airworthiness of such products.

131. In fact, these defendants did originally design, manufacture, sell and distribute the accident aircraft engines, turbochargers and replacement parts.

132. At all times material hereto the defendant Continental Motors was the Type Certificate Holder for the accident aircraft's engines.

133. The defendants designed, manufactured, tested, certified, distributed, sold, supplied and/or provided the defective and unreasonably dangerous accident aircraft engines and its component parts including the engines and turbochargers and fuel delivery system within the engine assemblies.

134. These defendants did further specify the fuel settings for the fuel servo, turbo waste gate, turbocharger and associated components; and did provide continuing airworthiness for these components, and are responsible for their ongoing support and safety.

135. In addition, these defendants provided instructions for continued airworthiness for the accident aircraft engines and turbochargers.

136. The dangerous defects which caused this accident existed at the time the accident aircraft's engines and its component parts were first sold, in that:

a. The defects in the aircraft engines, turbochargers and fuel delivery system existed at the time these components overhauled and sold by the defendants; and

b. The defects existed at the time the defendants distributed these components;

c. The defendant failed to warn of these defects; and

d. The defendant failed to provide adequate instruction for continued airworthiness and failed to provide engine troubleshooting information describing probable engine and fuel delivery malfunctions, engine and turbocharging system malfunctions, how to recognize these malfunctions, and the remedial actions for these malfunctions.

137. The accident aircraft engines, turbochargers and component parts were in substantially the same condition at the time of the accident as when first sold.

138. The defects which rendered the aircraft unreasonably dangerous and defective were, but are not limited to, the following:

a. Defective and unreasonably dangerous fuel delivery system;

b. Defective and unreasonably dangerous engines;

c. Defective and unreasonably dangerous and complex maintenance and inspection instructions;

27

d.     Defective and unreasonably dangerous engine performance in the event of a turbocharger malfunction;

e.     Defective and unreasonably dangerous turbocharging system;

f.     Inadequate materials used in construction;

g.     Inadequate testing of all engine components;

h.     Inadequate instructions to cope with loss of power;

i.     Inadequate design and construction of the engine to minimize the development of an unsafe condition between overhaul periods;

j.     Defective and inadequate instructions, warnings and information regarding the operation of the aircraft engine and its systems, components, accessories, and hardware;

k.     Defective and inadequate warnings concerning failures of the aircraft engine and its systems, components, accessories, and hardware;

l.     Defective instructions for continued airworthiness in that they failed to provide engine troubleshooting information describing probable engine malfunctions, how to recognize those malfunctions, and the remedial action for those malfunctions;

m.     Defective reporting of failures, malfunctions and defects in the engine products, parts, processes or articles that it has manufactured;

n.     Dangerous and defective systems, assemblies, components, parts and systems of the engine installed on the accident aircraft;

o.     Dangerous, defective and deficient engine, engine assemblies, turbocharging systems, components and systems, all of which failed to provide useful power to the aircraft and pilot;

28

p.      Defective design and construction of the engine and turbocharging systems, and associated system components;

q.      Defective and improper repair and inspection specifications and overhaul information for the engine and turbo charging systems, including turbochargers, waste gates, turbo controllers, check and oil return valves and associated system components;

r.      Improper manufacture of the engine and turbocharging systems, including turbochargers, waste gates, turbo controllers, check and oil return valves and associated system components utilized on the accident aircraft;

s.      defective and improper materials used for the engine and turbocharging systems, and associated system components;

t.      Defective and inadequate warnings concerning the failure modes associated with the accident engine and turbocharging systems;

u.      Improper material selection;

v.      Improper quality control;

w.      improper continuing airworthiness instructions concerning the engine, and turbocharging systems and associated system components;

x.      improper size and dimensions of the engine and turbocharging systems, including bearings, shafts, waste gates, turbo controllers, check and oil return valves and associated system components;

y.      failing to adequately safeguard against malfunctions of the turbocharging system installed on the accident aircraft;

z.      the engine and its turbocharging systems and associated system components were not capable of withstanding the naturally and/or foreseeable occurring engine operational stresses without suffering failure and seizure;

aa.     manufacturing, and selling an turbo charging and normalizing systems, including turbochargers, waste gates, turbo controllers, check and oil return valves and associated system components which did not withstand normal use; and

bb.     lack of any measures taken to correct these known defects.

139.    The foregoing defective conditions rendered the engine, its turbocharging systems, including turbo chargers and associated system components dangerous beyond a reasonable consumer's contemplation.

140.    These dangers inherent in the engine and turbo charging systems, and associated system components as described above were unknowable to Plaintiffs and unacceptable to the average or ordinary consumer.

141.    The accident aircraft engines, turbocharging systems, fuel delivery system components and accessories, were placed into the stream of commerce when it was originally sold by these defendants.

142.    At the time of the sale and at all times thereafter, the accident engines, turbochargers, fuel delivery system components and accessories were in a defective, unairworthy and unreasonably dangerous condition with manufacturing and/or design defects as aforesaid that were hidden and not obvious to the foreseeable users of the engines.

143.    The probability of harm to pilots and passengers including, personal injury, death, death by mutilation, and in some instances death by fire, associated with the inherent design and manufacturing defects identified herein and above outweigh the burden or cost of taking

30

precautions or utilizing safer alternatively designed products that would have prevented this accident.

144. The aforesaid inherent design and manufacturing defects increased the likelihood of an in-flight engine failure, had no usefulness or desirability in their condition, and could have been rectified with alternative safer products for little to no cost.

145. As a result of these defects, the accident aircraft suffered a power loss on takeoff, causing this crash and Plaintiffs' damages, described above.

WHEREFORE, Plaintiffs demand judgment against these defendants for all damages permitted by law, costs and interest as may be allowed by law, and requests trial by jury of all issues triable as a right by a jury.

### Count V
#### (Negligence)
#### *Plaintiffs v. Defendants Continental and Hartzell Engine Technologies*

146. Plaintiffs incorporate the above paragraphs as though set forth at length herein.

147. Defendants Continental and Hartzell are sellers, manufacturers and designers of products and owed duties to Plaintiffs' decedents to act as reasonably prudent manufacturers, designers, sellers, overhaulers, and maintainers and distributors of the subject engines and accessories, including their turbocharging systems and associated system components, and not to design, manufacturer, or sell defective products.

148. In addition to the duties imposed by common law, Defendants were subject to duties imposed by regulatory law to manufacture products in accordance with mandated engineering data and ones that would not detrimentally affect the airworthiness standards of the aircraft engine and engine components to which they were installed or render an aircraft unairworthy or unsafe.

31

149.    Defendants breached their duties and were negligent, grossly negligent, careless, and reckless by virtue of the following:

a.    failed to provide a properly designed engine, turbo charging system, including turbochargers, waste gates, turbo controllers, check and oil return valves and associated system components;

b.    failed to properly manufacture the engine, turbo charging systems, including turbochargers, waste gates, turbo controllers, check and oil return valves and associated system components;

c.    failed to properly provide guidance on setting and maintaining the turbo charging systems, including turbochargers, waste gates, turbo controllers, check and oil return valves and associated system components;

d.    failed to properly design the turbo charging systems, including turbochargers, waste gates, turbo controllers, check and oil return valves and associated system components to function properly between maintenance periods;

e.    failed to properly construct the engine, turbo charging systems, including turbochargers, turbocharger internal components, waste gates, turbo controllers, check and oil return valves and associated system components;

f.    failed to provide adequate instructions, warnings and information concerning the installation, overhaul and replacement of the turbo charging systems, including turbochargers, waste gates, turbo controllers, check and oil return valves and associated system components;

g.    failed to provide adequate instructions, warnings, and information concerning the inspection requirements for the engine, turbo charging systems, including

32

turbochargers, waste gates, turbo controllers, check and oil return valves and associated system components;

h.    failed to utilize a safe and proper design of the engine, turbo charging systems, including turbochargers, waste gates, turbo controllers, check and oil return valves and associated system components;

i.    failed to utilize safe and proper manufacture techniques for the engine, turbo charging systems, including turbochargers, waste gates, turbo controllers, check and oil return valves and associated system components;

j.    failed to select appropriate materials for components and replacement parts utilized in the engine and turbo charging systems and associated system components;

k.    failed to provide proper instructions, warnings, and information concerning the accident engine and turbo charging systems;

l.    failed to provide proper instructions, warnings, and information regarding the use and maintenance of the engines, turbo charging systems, waste gates, turbo controllers, check and oil return valves and associated system components;

m.    failed to provide proper instructions, warnings, and information concerning the inspection, troubleshooting, repair, and overhaul requirements for the accident engines, turbo charging systems, accessories and associated system components;

n.    failed to provide proper warnings concerning the failure modes associated with the accident engines, turbo charging systems, accessories and associated system components;

o.    failed to utilize proper material selection;

p.      failed to utilize proper quality control for the accident engines and associated accessories and components;

q.      failed to ensure there would not be an improper turbo condition in normal operation;

r.      failed to supply proper continuing airworthiness instructions concerning the engine, turbo charging systems, accessories and associated system components;

s.      failed to manufacture the engines, turbocharging system and associated components in accordance with size, materials selection, and dimensions mandated by engineering drawings;

t.      failed to adequately safeguard against malfunctions of the turbo charging system;

u.      failed to correct known defects in the engines, turbo charging systems, accessories and associated system components; and

v.      failed to correct, warn and prevent against other defects which will be shown at trial.

150.    As a direct result of these failures and negligence in design and product support, the accident aircraft lost engine power and impacted the Plaintiffs' residence because Defendants supplied components were unreasonably dangerous, defective and did cause Plaintiffs' injuries.

151.    Plaintiffs' injuries and damages, including the death of Plaintiff's decedent, were caused as a direct and proximate result of the foregoing negligent conduct.

WHEREFORE, Plaintiffs demand judgment against these defendants for all damages permitted by law, costs and interest as may be allowed by law, and requests trial by jury of all issues triable as a right by a jury.

### Count VI
**(BREACH OF EXPRESS AND IMPLIED WARRANTIES)**
***Plaintiffs v. Defendants Continental Motors and Hartzell Engine Technologies***

152.    Plaintiffs incorporate the above paragraphs as though set forth at length herein.

153.    Defendants were, and are at all times material hereto, merchants engaged in the business of designing, manufacturing, selling, supplying, supporting, repairing, distributing, licensing, overhauling, maintaining, and assembling engine assemblies, turbo charging systems, including turbochargers, waste gates, turbo controllers, check and oil return valves, accessories and associated system components as well as the associated operation, repair, overhaul, installation and product support materials.

154.    Defendants described and advertised goods for sale, including the engines, turbo charging systems, accessories and associated system components installed on the accident aircraft. Such descriptions and advertisements included, but were not limited to, advertising brochures, instructions, manuals, specification sheets, and other product statements

155.    These descriptions and affirmations concerning the goods resulted in express warranties that the goods were as described and safe for their intended use, airworthy, and conformed to approved and mandated engineering data.

156.    In addition, Defendants provided express and implied warranties for the accident engines, turbo charging systems, accessories and associated system components.

157.    These descriptions, representations, and affirmations resulted in oral and written express and implied warranties which regard the aforementioned components in the accident aircraft engines and turbocharging components.

158.    Defendants expressly and impliedly warranted that the accident aircraft's engine and turbo charging system, including turbochargers, accessories and associated components would

35

operate safely with these components and conformed to required engineering specifications and data.

159. These descriptions, affirmations, and express warranties became part of the bases of the bargain of their sales and said warranties ran to Plaintiffs' decedents as direct and/or intended third party beneficiaries from the use of the product.

160. Plaintiffs and Plaintiffs' decedent further relied upon these warranties.

161. As a result of the sales activities of Defendants, each expressly and impliedly warranted that its individual goods were merchantable, airworthy, fit for their ordinary purpose, conformed to design data, properly labeled and packaged for sale and installation, and conformed to the promises and affirmations of fact made on their containers and labels. These implied and express warranties ran from Defendants to Plaintiffs and their decedents as direct and/or intended beneficiaries.

162. As a result of the sales activities of Defendants, they impliedly warranted that their goods were fit for their particular purpose and suitable for the accident engine, and they knew that their skill and judgment would be relied upon and were, in fact, relied upon by the purchaser of their individual goods.

163. Because Defendants were merchants as to its goods offered for sale, there arises as a result of the "course of dealings" and "usage of trade" an implied warranty that each of its individual goods are safe and conform to design data.

164. By selling defective goods, Defendants and each of them breached the express warranties and the implied warranties of merchantability and fitness for particular purpose and the implied warranties arising from the course of dealings and usage of trade.

165. The breaches of warranties included the fact that Defendants did the following:

36

a.      defective design, manufacture and construction of the engines, fuel delivery system, turbo charging systems, including turbochargers and associated system components, as well as engine accessories;

b.      defective design, manufacture and construction of the engines, fuel delivery system, turbo charging systems, including turbochargers and associated system components, as well as engine accessories;

c.      defective and inadequate instructions, warnings and information concerning the engines, fuel delivery system, turbo charging systems, including turbochargers and associated system components, as well as engine accessories;

d.      defective and inadequate instructions, warnings, and information concerning the inspection requirements and replacement requirements for the engines, fuel delivery system, turbo charging systems, including turbochargers and associated system components, as well as engine accessories;

e.      improper design of the engines, fuel delivery system, turbo charging systems, including turbochargers and associated system components, as well as engine accessories;

f.      improper material selection of the engines, fuel delivery system, turbo charging systems, including turbochargers and associated system components, as well as engine accessories;

g.      improper quality control for the engines, fuel delivery system, turbo charging systems, including turbochargers and associated system components, as well as engine accessories;

37

h.      improper continuing airworthiness instructions concerning the engines, fuel delivery system, turbo charging systems, including turbochargers and associated system components, as well as engine accessories;

i.      improper size and dimensions of the engines, fuel delivery system, turbo charging systems, including turbochargers and associated system components, as well as engine accessories;

j.      the engine components, particularly the turbo charging systems and fuel delivery systems were not able to endure normal operating conditions without failure;

k.      the turbo system and components did not have adequate safeguards against failure;

l.      non-conformance of the engines, fuel delivery system, turbo charging systems, including turbochargers and associated system components, as well as engine accessories; and

m.      lack of any measures taken to correct these known defects.

166.    As a direct result of these breaches of warranties, failures, non-conformance, and design defects, the accident aircraft suffered an engine's turbo system failed and caused a power loss and was unreasonably dangerous, defective and did cause Plaintiffs' injuries and damages, and the death of Plaintiffs' decedent.

WHEREFORE, Plaintiffs demand judgment against these defendants for all damages permitted by law, costs and interest as may be allowed by law, and requests trial by jury of all issues triable as a right by a jury.

### Count VII
### (STRICT LIABILITY)
### *Plaintiffs v. Defendants SouthTec and Berkshire*

167.    Plaintiffs incorporate the above paragraphs as though set forth at length herein.

168.    Defendants were sellers within the context of strict liability in tort in that each manufactured and/or sold components utilized on the accident aircraft as well as provided maintenance instructions along with maintenance services.

169.    Specifically, these defendants sold items during the maintenance they performed on the accident aircraft, including the sale and installation of an overhauled and rebuilt engine and engine accessories.

170.    These defendants sold goods, in addition to services, for use in the accident aircraft.

171.    Plaintiffs make this claim against these defendants, under the theory of strict liability in that:

    a.    The defects in the aircraft, its fuel system, engine and components, accessories, turbo charging system, oil system, hardware and firmware existed at the time these components overhauled and sold by the defendants; and

    b.    The defects existed at the time the defendants distributed these components;

    c.    The defendant failed to warn of these defects;

    d.    The defendants allowed maintenance to be performed and did direct such maintenance which rendered the aircraft unsafe; and

    e.    The defendants failed to provide adequate instructions for continued airworthiness and failed to provide engine troubleshooting information describing probable engine and fuel delivery malfunctions, turbocharging system malfunctions, how to recognize these malfunctions, and the remedial actions for these malfunctions.

39

172.     The defects in the engine, fuel system, and turbocharging system were a proximate and direct cause of the accident that caused the injuries and damage set forth hereinabove.

173.     At all times material, the aircraft, its fuel system, engine and components, accessories, turbo charging system, oil system, hardware and firmware were defective, resulting in an unreasonably dangerous condition which was a substantial factor and proximate cause in the crash of the subject aircraft.

174.     The defects in the aircraft, its fuel system, engine and components, accessories, turbo charging system, oil system, hardware and firmware and instructions were manufactured, designed, distributed, supplied, assembled, installed and/or sold by these defendants in a defective and unreasonably dangerous condition. The defective and unreasonably dangerous condition resulted from defective manufacture and/or defective design and/or assembly and/or installation and/or failure to provide adequate warnings or instructions, includes, but is not limited to:

a.     defective design of the aircraft, its fuel system, engine and components, accessories, turbo charging system, oil system, hardware and firmware, which were defective in they were not designed and constructed to operate safely;

b.     defective fuel delivery system;

c.     defective turbocharging system;

d.     defective engine accessories;

e.     defective rigging components for the engines on the accident aircraft;

f.     inadequate materials used in construction;

g.     inadequate testing of all engine components;

h.     inadequate instructions to cope with loss of power;

40

i.       inadequate design and construction of the engine to minimize the development of an unsafe condition between overhaul periods;

j.       defective and inadequate instructions, warnings and information regarding the operation of the aircraft and its engines, systems, components, accessories, and hardware;

k.       defective and inadequate warnings concerning failures of the aircraft engine and its systems, components, accessories, and hardware;

l.       defective instructions for continued airworthiness in that they failed to provide engine troubleshooting information describing probable engine malfunctions, how to recognize those malfunctions, and the remedial action for those malfunctions;

m.       defective reporting of failures, malfunctions and defects in the engine products, parts, processes or articles that it has manufactured;

n.       dangerous and defective systems, assemblies, components, parts and systems of the engine installed on the accident aircraft;  and

o.       dangerous, defective and deficient engine, engine assemblies, components and systems, all of which failed to provide useful power to the aircraft and pilot.

175.     The aircraft, its fuel system, engine and components, accessories, turbo charging system, oil system, hardware and firmware were placed into the stream of commerce when originally sold by these defendants.

176.     At the time of the sale and at all times thereafter, the aircraft, its fuel system, engine and components, accessories, turbo charging system, oil system, hardware and firmware were in a defective, unairworthy and unreasonably dangerous condition with manufacturing and/or design defects as aforesaid that were hidden and not obvious to the foreseeable users.

41

177.     As a direct result of these failures and design defects, the accident aircraft was unreasonably dangerous, defective and did cause Plaintiffs' and their decedent's injuries and damages as alleged above.

WHEREFORE, Plaintiffs demand judgment against these defendants for all damages permitted by law, costs and interest as may be allowed by law, and requests trial by jury of all issues triable as a right by a jury.

### Count VIII
### (NEGLIGENCE)
### *Plaintiffs v. Defendants SouthTec and Berkshire*

178.     Plaintiffs incorporate the above paragraphs as though set forth at length herein.

179.     The negligence of the Defendants SouthTec and Berkshire was a substantial contributing cause in the crash of the accident airplane and Plaintiffs' resulting injuries, damages and losses.

180.     These Defendants had a duty to exercise reasonable care in regard to the maintenance, testing, troubleshooting, manufacture, installation, assembly, re-assembly, repair, inspection, and overhaul of the subject aircraft, its engines, turbochargers and its components, accessories, hardware and firmware.

181.     In addition to the duties imposed by common law, Defendants were subject to duties imposed by regulatory law.

182.     Defendants breached their duty and were negligent, grossly negligent, reckless, willful and/or wanton in that they, among other things:

a.     maintained, tested, troubleshot, manufactured, installed, assembled, re-assembled, repaired, inspected, and/or overhauled and returned to service the aircraft, its

42

fuel system, engine and components, accessories, turbo charging system, oil system, hardware and firmware in an improper and unsafe manner that caused the a power loss;

b.      maintained, tested, troubleshot, manufactured, installed, assembled, re-assembled, repaired, inspected, and/or overhauled and returned to service the aircraft, its fuel system, engine and components, accessories, turbo charging system, oil system, hardware and firmware in an improper and unsafe manner;

c.      maintained, tested, troubleshot, manufactured, installed, assembled, re-assembled, repaired, inspected, and/or overhauled and returned to service the aircraft, its fuel system, engine and components, accessories, turbo charging system, oil system, hardware and firmware in an improper and unsafe manner and failed and neglected to reasonably test the aircraft engine, turbocharger and components, accessories, hardware and firmware;

d.      maintained, tested, troubleshot, manufactured, installed, assembled, re-assembled, repaired, inspected, and/or overhauled and returned to service the aircraft, its fuel system, engine and components, accessories, turbo charging system, oil system, hardware and firmware in an improper and unsafe manner and failed and neglected to adequately warn of the defects in the aircraft's engine, components, turbocharger, turbo system, accessories, hardware and firmware;

e.      maintained, tested, troubleshot, manufactured, installed, assembled, re-assembled, repaired, inspected, and/or overhauled and returned to service the aircraft, its fuel system, engine and components, accessories, turbo charging system, oil system, hardware and firmware in an improper and unsafe manner and failed and neglected to

43

correct known defects in the aircraft's, its engine and components, accessories, hardware and firmware;

f.      maintained, tested, troubleshot, manufactured, installed, assembled, re-assembled, repaired, inspected, and/or overhauled and returned to service the aircraft, its fuel system, engine and components, accessories, turbo charging system, oil system, hardware and firmware in an improper and unsafe manner and failed and neglected to inspect, overhaul, maintain, retrofit and/or repair the subject aircraft and its engine in a reasonable and competent manner;

g.      carelessly, recklessly, and negligently failed to warn of the defects, deficiencies, malfunctions and other problems impacting the airworthiness of the accident aircraft, its fuel system, engine and components, accessories, turbo charging system, oil system, hardware and firmware prior to the return to service of same;

h.      carelessly, recklessly, and negligently failed to properly distribute and provide instructions for the safe operation of the aircraft and its engine;

i.      carelessly, recklessly, and negligently failed to identify all defects and deficiencies in the accident aircraft, its fuel system, engine and components, accessories, turbo charging system, oil system, hardware and firmware and to troubleshoot same and follow through with regard to making certain that the engine and turbo system functioned safely and properly on the aircraft;

j.      carelessly, recklessly, and negligently failed to modify, redesign, and/or correct deficiencies in the aircraft, engine, turbo system, components and assemblies;

k.      carelessly, recklessly, and negligently failed to inspect the aircraft and its engine, turbo system and associated components, accessories, hardware and firmware;

44

l.      carelessly, recklessly, and negligently failed to repair, overhaul and/or rebuild the aircraft engine, turbo system, accessories, hardware and firmware;

m.      carelessly, recklessly, and negligently failed to properly assemble the aircraft, its engine, turbo system, components, systems, and assemblies, accessories, hardware and firmware;

n.      carelessly, recklessly and negligent failed to re-assemble the aircraft, its engine, turbo system, components, systems, and assemblies, accessories, hardware and firmware;

o.      carelessly, recklessly, and negligently failed to properly supervise its agents and employees to make certain they were knowledgeable and capable of maintaining, testing, troubleshooting, manufacturing, installing, assembling, reassembling, repairing, inspection, overhauling, operating, and servicing the accident aircraft, its fuel system, engine and components, accessories, turbo charging system, oil system, hardware and firmware;

p.      carelessly, recklessly, and negligently failed to correct deficiencies in the aircraft, its engine, turbo normalizing system, components and assemblies in order to prevent failures;

q.      carelessly, recklessly and negligently failed to take those steps of a reasonable repairer, overhauler, and supplier of aircraft engines and component parts to make certain that the aircraft delivered were not defective and reasonably dangerous;

r.      failed to properly overhaul, maintain and inspect the engine, utilizing accepted methods, techniques and products;

45

s.       failed to ensure the turbo system functioned properly and would not result in the loss of engine power;

t.       carelessly, recklessly, and negligently failing to comply with applicable Federal Aviation Rules and Regulations; and

u.       Defendants were negligent in other respects to be shown at trial.

183.   As a direct and proximate result of the foregoing breach, Plaintiffs and their decedent suffered pre-impact fear, severe emotional distress, conscious pain and suffering, serious personal injuries, loss of services, aid and society, pecuniary injuries and damages including, but not limited to, loss of earnings and earning capacity and loss of their house.  Plaintiffs are entitled to recover compensatory damages in an amount to be determined at trial.

WHEREFORE, Plaintiffs demand judgment against these defendants for all damages permitted by law, costs and interest as may be allowed by law, and requests trial by jury of all issues triable as a right by a jury.

### Count IX
**(BREACH OF CONTRACT)**
*Plaintiffs v. Defendants SouthTec and Berkshire*

184.   Plaintiffs incorporate the above paragraphs as though set forth at length herein.

185.   The aircraft's owner brought the accident aircraft to each of these Defendants for repairs, modification, improvements, maintenance and inspection on numerous occasions.

186.   There arose an agreement between the aircraft's owner and pilot and these Defendants where in exchange for an agreement to pay the charges rendered, Defendants agreed to provide maintenance services to the airframe, avionics and powerplants of the accident aircraft.

187.   Copies of the records reflecting this agreement are reflected in the logbook for the accident aircraft and documents in the possession the Defendants.

46

188.     There also arose an agreement that the work performed by the Defendants would be to industry standards and in a good and workmanlike manner.

189.     In beach of that contract, Defendants did fail to maintain the accident aircraft as agreed.

190.     As a direct result of the breach of contract and breach of warranty of repair, the aircraft crashed and Plaintiffs suffered injuries and perished, suffering pre-impact fear, severe emotional distress, conscious pain and suffering, serious personal injuries, loss of services, aid and society, pecuniary injuries and damages including, but not limited to, loss of earnings and earning capacity and property damage. Plaintiffs are entitled to recover compensatory damages in an amount to be determined at trial.

WHEREFORE, Plaintiffs demand judgment against these defendants for all damages permitted by law, costs and interest as may be allowed by law, and requests trial by jury of all issues triable as a right by a jury.

## Count X
### (BREACH OF EXPRESS AND IMPLIED WARRANTIES)
### *Plaintiffs v. Defendants SouthTec and Berkshire*

191.     Plaintiffs incorporate the above paragraphs as though set forth at length herein.

192.     These Defendants performed maintenance, inspections and engine maintenance on the accident aircraft, its engines, turbochargers, fuel system, ignition system, components accessories and assemblies.

193.     Defendants are now, and were at all times material hereto, merchants engaged in the business of maintaining, testing, troubleshooting, manufacturing, installing, assembling, re-assembling, repairing, inspecting, overhauling, and/or selling aircraft, component parts and aircraft

47

engines and accessories including the accident aircraft, its engines, fuel system, turbo systems and associated components.

194.     Defendants expressly and/or impliedly warranted that the accident aircraft, its engines, turbochargers, fuel system, ignition system, components accessories and assemblies and the maintenance and overhaul performed were free of material defects, done in a professional, competent, and workmanlike manner, and that the accident aircraft and its engines were safe for flight and that these warranties ran to Plaintiffs and their decedent.

195.     Defendants warranted that the accident aircraft, its engines, turbochargers, fuel system, ignition system, components accessories and assemblies, overhaul techniques and practices and other systems would be of excellent quality, merchantable and fit for the particular purpose intended, that is, safe flight as an aircraft in all reasonably anticipatable conditions.

196.     At all times material hereto, Defendants breached their warranties of fitness and for merchantability in that the aircraft was not fit for flight conditions reasonably anticipatable for flight by such aircraft, and it was not merchantable in that it was not properly and safely equipped to fly.

197.     Defendants described and advertised the accident aircraft, goods and services for sale.  Such descriptions and advertisements included, but were not limited to, advertising brochures, instructions, manuals, specification sheets, web based information and other products, statements and representations.

198.     These descriptions, representations, and affirmations concerning the goods and services of Defendants resulted in express and/or implied warranties that the goods were as described and sold for their intended use.

199.	In addition, Defendants provided an express and implied warranty for the accident aircraft, its engines, turbochargers, fuel system, ignition system, components accessories and assemblies.

200.	These warranties were relied upon and became a basis for the bargain at the time of the purchase of services by the aircraft's current and former owners and operators and were relied upon by the passengers aboard the accident aircraft.

201.	These descriptions, representations, affirmations and express and/or implied warranties became part of the basis of the bargain of their sale and these warranties ran to Plaintiffs and Plaintiffs' decedent.

202.	Defendants breached the warranties of fitness and merchantability because the aircraft was not fit for safe flight and the work performed fell below standards of professionalism and competence.

203.	As a direct result of the breach of contract and breach of warranty of repair, the aircraft crashed and Plaintiffs and their decedent suffered injuries and death, as detailed above.

WHEREFORE, Plaintiffs demand judgment against these defendants for all damages permitted by law, costs and interest as may be allowed by law, and requests trial by jury of all issues triable as a right by a jury.

### Count XI
#### (STRICT LIABILITY)
##### *Plaintiffs v. Defendant Pine Mountain Aviation*

204.	Plaintiffs incorporate the above paragraphs as though set forth at length herein.

205.	Defendant was the seller within the context of strict liability in tort in that it manufactured and sold components utilized on the accident aircraft as well as provided maintenance instructions, specifically including, but not limited to, its left engine assembly.

49

206.    Specifically, these defendants sold items during the maintenance they performed on the accident aircraft and its engine, including the sale and installation of overhauled and rebuilt engine and engine accessories.

207.    These defendants sold goods, in addition to services, for use in the accident aircraft.

208.    Plaintiffs make this claim against these defendants, under the theory of strict liability in that:

    a.    The defects in the aircraft, its fuel system, engine(s) and components, accessories, turbo charging system, oil system, hardware and firmware existed at the time these components overhauled and sold by defendant; and

    b.    The defects existed at the time defendant distributed these components;

    c.    The defendant failed to warn of these defects;

    d.    Defendant allowed maintenance to be performed and did direct such maintenance which rendered the aircraft unsafe; and

    e.    Defendant failed to provide adequate instruction for continued airworthiness and failed to provide engine troubleshooting information describing probable engine and fuel delivery malfunctions, turbocharging system malfunctions, how to recognize these malfunctions, and the remedial actions for these malfunctions.

209.    The defects in the engine(s), fuel system, and turbo system were a proximate and direct cause of the accident that caused the injuries and damage set forth hereinabove.

210.    At all times material, the aircraft, its fuel system, engine(s) and components, accessories, turbo charging system, oil system, hardware and firmware were defective, resulting in an unreasonably dangerous condition which was a substantial factor and proximate cause in the crash of the subject aircraft.

50

211. The defects in the aircraft, its fuel system, engine(s) and components, accessories, turbo charging system, oil system, hardware and firmware and instructions were manufactured, designed, distributed, supplied, assembled, installed and/or sold by defendant in a defective and unreasonably dangerous condition. The defective and unreasonably dangerous condition resulted from defective manufacture and/or defective design and/or assembly and/or installation and/or failure to provide adequate warnings or instructions, includes, but is not limited to:

a. defective design and overhaul and assembly of the engine(s), its fuel system and components, accessories, turbo charging system, oil system, hardware and firmware, which were defective in they were not designed and constructed to operate safely;

b. defective fuel delivery system;

c. defective turbocharging system;

d. defective engine accessories;

e. defective rigging components for the engine(s) on the accident aircraft;

f. inadequate materials used in construction;

g. inadequate testing of all engine components;

h. inadequate instructions to cope with loss of power;

i. inadequate design and construction of the engine to minimize the development of an unsafe condition between overhaul periods;

j. defective and inadequate instructions, warnings and information regarding the operation of the aircraft and its engine(s), systems, components, accessories, and hardware;

k. defective and inadequate warnings concerning failures of the aircraft engine(s) and its systems, components, accessories, and hardware;

51

l.      defective instructions for continued airworthiness in that they failed to provide engine troubleshooting information describing probable engine malfunctions, how to recognize those malfunctions, and the remedial action for those malfunctions;

m.      defective reporting of failures, malfunctions and defects in the engine products, parts, processes or articles that it has manufactured;

n.      dangerous and defective systems, assemblies, components, parts and systems of the engine installed on the accident aircraft;  and

o.      dangerous, defective and deficient engine, engine assemblies, components and systems, all of which failed to provide useful power to the aircraft and pilot.

212.    The aircraft's fuel system, engine(s) and components, accessories, turbo charging system, oil system, hardware and firmware were placed into the stream of commerce when originally sold by these defendants.

213.    At the time of the sale and at all times thereafter, the aircraft, its fuel system, engine(s) and components, accessories, turbo charging system, oil system, hardware and firmware were in a defective, unairworthy and unreasonably dangerous condition with manufacturing and/or design defects as aforesaid that were hidden and not obvious to the foreseeable users.

214.    As a direct result of these failures and design defects, the accident aircraft was unreasonably dangerous, defective and did cause Plaintiffs' and their decedent's injuries and damages as alleged above.

WHEREFORE, Plaintiffs demand judgment against these defendants for all damages permitted by law, costs and interest as may be allowed by law, and requests trial by jury of all issues triable as a right by a jury

## Count XII
### (NEGLIGENCE)
### *Plaintiffs v. Defendant Pine Mountain Aviation*

215.    Plaintiffs incorporate the above paragraphs as though set forth at length herein.

216.    The negligence of the Defendant Pine Mountain was a substantial contributing cause in the crash of the accident airplane and Plaintiffs' resulting injuries, damages and losses.

217.    Defendant had a duty to exercise reasonable care in regard to the maintenance, testing, troubleshooting, manufacture, installation, assembly, re-assembly, repair, inspection, and overhaul of the subject aircraft's engine(s), turbocharger(s) and its components, accessories, hardware and firmware.

218.    In addition to the duties imposed by common law, Defendant was subject to duties imposed by regulatory law.

219.    Defendants breached their duty and were negligent, grossly negligent, reckless, willful and/or wanton in that they, among other things:

        a.      maintained, tested, troubleshot, manufactured, installed, assembled, re-assembled, repaired, inspected, and/or overhauled and returned to service the aircraft, its fuel system, engine(s) and components, accessories, turbo charging system, oil system, hardware and firmware in an improper and unsafe manner that caused the a power loss;

        b.      maintained, tested, troubleshot, manufactured, installed, assembled, re-assembled, repaired, inspected, and/or overhauled and returned to service the aircraft, its fuel system, engine(s) and components, accessories, turbo charging system, oil system, hardware and firmware in an improper and unsafe manner;

        c.      maintained, tested, troubleshot, manufactured, installed, assembled, re-assembled, repaired, inspected, and/or overhauled and returned to service the aircraft, its

fuel system, engine(s) and components, accessories, turbo charging system, oil system, hardware and firmware in an improper and unsafe manner and failed and neglected to reasonably test the aircraft engine, turbocharger and components, accessories, hardware and firmware;

      d.     maintained, tested, troubleshot, manufactured, installed, assembled, re-assembled, repaired, inspected, and/or overhauled and returned to service the aircraft, its fuel system, engine(s) and components, accessories, turbo charging system, oil system, hardware and firmware in an improper and unsafe manner and failed and neglected to adequately warn of the defects in the aircraft's engine(s), components, turbocharger, turbo system, accessories, hardware and firmware;

      e.     maintained, tested, troubleshot, manufactured, installed, assembled, re-assembled, repaired, inspected, and/or overhauled and returned to service the aircraft, its fuel system, engine(s) and components, accessories, turbo charging system, oil system, hardware and firmware in an improper and unsafe manner and failed and neglected to correct known defects in the aircraft, its engine(s) and components, accessories, hardware and firmware;

      f.     maintained, tested, troubleshot, manufactured, installed, assembled, re-assembled, repaired, inspected, and/or overhauled and returned to service the aircraft, its fuel system, engine(s) and components, accessories, turbo charging system, oil system, hardware and firmware in an improper and unsafe manner and failed and neglected to inspect, overhaul, maintain, retrofit and/or repair the subject aircraft and its engine(s) in a reasonable and competent manner;

g. carelessly, recklessly, and negligently failed to warn of the defects, deficiencies, malfunctions and other problems impacting the airworthiness of the accident aircraft, its fuel system, engine(s) and components, accessories, turbo charging system, oil system, hardware and firmware prior to the return to service of same;

h. carelessly, recklessly, and negligently failed to properly distribute and provide instructions for the safe operation of the aircraft and its engine(s);

i. carelessly, recklessly, and negligently failed to identify all defects and deficiencies in the accident aircraft, its fuel system, engine(s) and components, accessories, turbo charging system, oil system, hardware and firmware and to troubleshoot same and follow through with regard to making certain that the engine(s) and turbo system functioned safely and properly on the aircraft;

j. carelessly, recklessly, and negligently failed to modify, redesign, and/or correct deficiencies in the aircraft, engine(s), turbo system, components and assemblies;

k. carelessly, recklessly, and negligently failed to inspect the aircraft and its engine(s), turbo system and associated components, accessories, hardware and firmware;

l. carelessly, recklessly, and negligently failed to repair, overhaul and/or rebuild the aircraft engine(s), turbo system, accessories, hardware and firmware;

m. carelessly, recklessly, and negligently failed to properly assemble the aircraft, its engine(s), turbo system, components, systems, and assemblies, accessories, hardware and firmware;

n. carelessly, recklessly and negligent failed to re-assemble the aircraft, its engine(s), turbo system, components, systems, and assemblies, accessories, hardware and firmware;

55

o.      carelessly, recklessly, and negligently failed to properly supervise its agents and employees to make certain they were knowledgeable and capable of maintaining, testing, troubleshooting, manufacturing, installing, assembling, reassembling, repairing, inspection, overhauling, operating, and servicing the accident aircraft, its fuel system, engine(s) and components, accessories, turbo charging system, oil system, hardware and firmware;

p.      carelessly, recklessly, and negligently failed to correct deficiencies in the aircraft, its engine(s), turbo normalizing system, components and assemblies in order to prevent failures;

q.      carelessly, recklessly and negligently failed to take those steps of a reasonable repairer, overhauler, and supplier of aircraft engine(s) and component parts to make certain that the aircraft delivered were not defective and reasonably dangerous;

r.      failed to properly overhaul, maintain and inspect the engine(s), utilizing accepted methods, techniques and products;

s.      failed to ensure the turbo system functioned properly and would not result in the loss of engine power;

t.      carelessly, recklessly, and negligently failing to comply with applicable Federal Aviation Rules and Regulations; and

u.      Defendants were negligent in other respects to be shown at trial.

220.    As a direct and proximate result of the foregoing breaches, Plaintiffs and their decedent suffered pre-impact fear, severe emotional distress, conscious pain and suffering, serious personal injuries, loss of services, aid and society, pecuniary injuries and damages including, but

not limited to, loss of earnings and earning capacity and loss of their house. Plaintiffs are entitled to recover compensatory damages in an amount to be determined at trial.

WHEREFORE, Plaintiffs demand judgment against these defendants for all damages permitted by law, costs and interest as may be allowed by law, and requests trial by jury of all issues triable as a right by a jury.

### Count XIII
#### (BREACH OF CONTRACT)
#### *Plaintiffs v. Defendant Pine Mountain Aviation*

221.    Plaintiffs incorporate the above paragraphs as though set forth at length herein.

222.    The aircraft's owner brought the accident aircraft and specifically its engine to this Defendants for repairs, modification, improvements, maintenance and inspection.

223.    There arose an agreement between the aircraft's owner and pilot and Defendant where in exchange for an agreement to pay the charges rendered, Defendant agreed to provide maintenance services, and specifically in the form of a major overhaul and inspection of the engine assembly and associated accessories.

224.    Copies of the records reflecting this agreement are reflected in the logbook for the accident aircraft and documents in the possession the Defendant.

225.    There also arose an agreement that the work performed by the Defendant would be to industry standards and in a good and workmanlike manner.

226.    In beach of that contract, Defendant did fail to maintain the accident aircraft and its engine(s) as agreed.

227.    As a direct result of the breach of contract and breach of warranty of repair, the aircraft crashed and Plaintiffs suffered injuries and perished, suffering pre-impact fear, severe emotional distress, conscious pain and suffering, serious personal injuries, loss of services, aid and

57

society, pecuniary injuries and damages including, but not limited to, loss of earnings and earning capacity and property damage. Plaintiffs are entitled to recover compensatory damages in an amount to be determined at trial.

WHEREFORE, Plaintiffs demand judgment against these defendants for all damages permitted by law, costs and interest as may be allowed by law, and requests trial by jury of all issues triable as a right by a jury.

### Count XIV
#### (BREACH OF EXPRESS AND IMPLIED WARRANTIES)
#### *Plaintiffs v. Defendant Pine Mountain Aviation*

228. Plaintiffs incorporate the above paragraphs as though set forth at length herein.

229. Defendant performed maintenance, inspections and engine maintenance on the accident aircraft, its engines, turbochargers, fuel system, ignition system, components accessories and assemblies.

230. Defendant is now, and were at all times material hereto, merchants engaged in the business of maintaining, testing, troubleshooting, manufacturing, installing, assembling, re-assembling, repairing, inspecting, overhauling, and/or selling aircraft, component parts and aircraft engines and accessories including the accident aircraft, its engines, fuel system, turbo systems and associated components.

231. Defendant expressly and/or impliedly warranted that the accident aircraft, its engines, turbochargers, fuel system, ignition system, components accessories and assemblies and the maintenance and overhaul performed were free of material defects, done in a professional, competent, and workmanlike manner, and that the accident aircraft and its engines were safe for flight and that these warranties ran to Plaintiffs and their decedent.

58

232. Defendant warranted that the accident aircraft, its engines, turbochargers, fuel system, ignition system, components accessories and assemblies, overhaul techniques and practices and other systems would be of excellent quality, merchantable and fit for the particular purpose intended, that is, safe flight as an aircraft in all reasonably anticipatable conditions.

233. At all times material hereto, Defendant breached their warranties of fitness and for merchantability in that the aircraft was not fit for flight conditions reasonably anticipatable for flight by such aircraft, and it was not merchantable in that it was not properly and safely equipped to fly.

234. Defendant described and advertised the accident aircraft, engine, goods and services for sale. Such descriptions and advertisements included, but were not limited to, advertising brochures, instructions, manuals, specification sheets, web based information and other products, statements and representations.

235. These descriptions, representations, and affirmations concerning the goods and services of Defendant resulted in express and/or implied warranties that the goods were as described and sold for their intended use.

236. In addition, Defendant provided an express and implied warranty for the accident aircraft, its engines, turbochargers, fuel system, ignition system, components accessories and assemblies.

237. These warranties were relied upon and became a basis for the bargain at the time of the purchase of services by the aircraft's current and former owners and operators and were relied upon by the passengers aboard the accident aircraft.

238. These descriptions, representations, affirmations and express and/or implied warranties became part of the basis of the bargain of their sale and these warranties ran to Plaintiffs and Plaintiffs' decedent.

239. Defendant breached the warranties of fitness and merchantability because the aircraft was not fit for safe flight and the work performed fell below standards of professionalism and competence.

240. As a direct result of the breach of contract and breach of warranty of repair, the aircraft crashed and Plaintiffs and their decedent suffered injuries and death, as detailed above.

WHEREFORE, Plaintiffs demand judgment against these defendants for all damages permitted by law, costs and interest as may be allowed by law, and requests trial by jury of all issues triable as a right by a jury.

### COUNT XV
### (NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS)
### *Plaintiffs HANNAH BOCKER AND SARAH BOCKER v. ALL Defendants*

241. Plaintiff incorporates by reference the above paragraphs as though set forth at length herein.

242. Each Defendant owed a duty to Plaintiffs, as described above.

243. Each Defendant's breach of duty proximately caused the accident and was a proximate cause of the emotional distress that naturally resulted to Plaintiffs as a result of each Defendants' act.

244. The Plaintiffs were inside the residence which the accident aircraft impacted when it crashed and therefore experienced and observed the accident sequence and ensuing fire, and were within the zone of danger of the accident, and witnessed the injury to and eventual death of their father, GERARD BOCKER.

60

245.     The impact and ensuing fire left no doubt in Plaintiffs' mind that they would be injured or worse, perish in the conflagration as they were physically present in the Zone of Danger.

246.     After the aircraft impacted the house, Plaintiffs had to wait for emergency personnel to locate and rescue them – all the while he was suffering the injuries explained above.

247.     As a direct and proximate result of Defendants' negligence and/or defective products, Plaintiffs suffered and continue to suffer emotional and physical injuries which were a direct result of the accident and were foreseeable to Defendants.

248.     Plaintiffs suffered the aforementioned injuries and damages as a direct result from the sensory and contemporaneous observance of the accident and fear of the impending death by mutilation and serious bodily injury.

WHEREFORE, Plaintiffs demand judgment against these defendants for all damages permitted by law, costs and interest as may be allowed by law, and requests trial by jury of all issues triable as a right by a jury.

### COUNT XVI
### (NEGLIGENCE)
***Plaintiff SARAH BOCKER v. Defendants Hergin Aviation and Knipping-Diaz Associates, Inc.***

249.     Plaintiffs incorporate by reference the above paragraphs as though set forth at length herein.

250.     That as a result of the aforementioned crash on August 17, 2019 plaintiff SARAH BOCKER was seriously injured, lost her possessions in the resultant fire and suffered numerous other damages.

251.     That the aforesaid occurrence was caused by reason of the negligence of the Hergin Aviation and Knipping-Diaz Associates Defendants without any fault or negligence on the part of the Plaintiff contributing thereto.

61

252.     That Defendants were negligent, careless and reckless in the ownership, operation, management, maintenance, supervision, use and control of the aforesaid airplane and airport and the Defendants were otherwise negligent, careless and reckless under the circumstances then and there prevailing.

253.     That this action falls within one or more of the exceptions set forth in CPLR 1602.

254.     That by reason of the foregoing, Plaintiff SARAH BOCKER has been damaged in a sum exceeding the jurisdictional limits of all lower courts which would otherwise have jurisdiction.

WHEREFORE, Plaintiffs demand judgment against these defendants for all damages permitted by law, costs and interest as may be allowed by law, and requests trial by jury of all issues triable as a right by a jury.

## COUNT XVI
### (BREACH OF WARRANTIES)
***Plaintiff SARAH BOCKER v. Defendants Hergin Aviation and Knipping-Diaz Associates, Inc.***

255.     Plaintiffs incorporate by reference the above paragraphs as though set forth at length herein.

256.     As of all times relevant herein, the aforementioned Cessna model 303 airplane was at some point in the custody of the various defendants and each of them for the purposes of repairs, fueling, maintenance, modification and overhaul and each of them expressly and impliedly warranted that said aircraft and its systems were "airworthy", "safe and fit for use" "approved for return to service" and could be safely flown.

257.     In fact, said aircraft, its component parts and its various systems were not airworthy, safe and fit for normal use but were in a dangerous and defective condition, by virtue of defects in

62

the modification, overhaul, services and maintenance of the aircraft's parts and systems which were caused by or negligently ignored by the defendants.

258.     As a proximate result of the negligence and carelessness of the defendants the subject aircrafts' engine or engines failed and caused it to crash thereby resulting in the damages to plaintiffs referred to above.

259.     That by reason of the foregoing, Plaintiffs have been damaged in a sum exceeding the jurisdictional limits of all lower courts which would otherwise have jurisdiction.

WHEREFORE, Plaintiffs demand judgment against these defendants for all damages permitted by law, costs and interest as may be allowed by law, and requests trial by jury of all issues triable as a right by a jury.

DATED:          August 11, 2021
                Eastchester, New York

                          /s/     *Michael Miska*

                          _____

                          Michael Miska, Esq.
                          The Wolk Law Firm
                          Attorneys for Plaintiffs, Hannah Bocker,
                          Sarah Bocker and
                          Barbara Bocker, As Administrator of the
                          Estate of Gerard Bocker and Individually
                          1710-12 Locust Street
                          Philadelphia, PA 19103

                          Co-counsel Thomas G. Cascione
                          Co-Attorney(s) for Plaintiffs Hannah &
                          Barabara Bocker as Administrator of the
                          Estate of Gerard Bocker and Individually
                          Cascione Purcigliotti and Galluzzi P.C.
                          274 White Plains Road, 2nd Floor, Suite 6
                          Eastchester, NY 10709-4419
                          Telephone No.: (914) 961-1263

<u>VERIFICATION</u>

STATE OF NEW YORK          )
                          ) ss
COUNTY OF WESTCHESTER     )

I, Thomas G. Cascione, an attorney admitted to practice in the courts of New York State, under penalty of perjury state that I am one of the attorneys for the Plaintiffs in the above-entitled action. I have read the foregoing VERIFIED COMPLAINT and know the contents thereof. The same is true as to my knowledge, except as to matters therein stated to be alleged on information and belief, and that, as to those matters, I believe them to be true. The grounds of my belief as to all matters not stated upon my own knowledge are the materials in my file and the investigation conducted by my office. I make this verification instead of the plaintiffs because the plaintiffs do not reside in Westchester County wherein I have my law offices.

Dated:   August 11, 2021

THOMAS G. CASSCIONE