**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| HANNA BOCKER, SARAH BOCKER and BARBARA BOCKER as Administrator of the Estate of GERARD BOCKER and BARBARA BOCKER, Individually, | ) ) ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 21-1174-MN-CJB |
| | ) | |
| HARTZELL ENGINE TECHNOLOGIES, LLC and CONTINENTAL AEROSPACE TECHNOLOGIES, INC. f/k/a CONTINENTAL MOTORS, INC., | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

**REPORT AND RECOMMENDATION**

In this action filed by Plaintiffs Hannah Bocker, Sarah Bocker and Barbara Bocker

Individually and as Administrator of the Estate of Gerard Bocker ("Plaintiffs"), presently before

the Court is Defendant Continental Aerospace Technologies, Inc. f/k/a Continental Motors,

Inc.'s ("Continental") motion to dismiss Plaintiffs' Second Amended Complaint ("SAC") against

it, or to strike portions of the SAC, pursuant to Federal Rules of Civil Procedure 12(b)(6) and

12(f) (the "Motion").  (D.I. 50)  For the reasons that follow, the Court recommends that the

Motion be GRANTED and that the SAC's claims against Continental be dismissed.

I.      **BACKGROUND**

   A.      **Factual Background**

This matter arises from the August 17, 2019 crash of a Cessna T303 aircraft (the

"aircraft") in Lagrangeville, New York.  (D.I. 48 at ¶ 17)  The aircraft was piloted by Francisco

Knipping-Diaz and it held two passengers, Teofilo Antonio Diaz and Eduardo Tio.  (*Id*. at ¶¶ 20-

21)  Shortly after takeoff from an airport in Lagrangeville, the aircraft lost engine power at a low

altitude and was unable to climb.  (*Id*. at ¶¶ 22, 25, 62)  As a result of this failure to climb, the

pilot lost directional control and the aircraft began to drift left; thereafter, it rolled left and

ultimately crashed and hit the Bocker family's residence.  (*Id*. at ¶¶ 26-27, 62, 64-65)  Both the

aircraft and the Bocker residence burst into flames.  (*Id*. at ¶¶ 29, 65)

Inside the Bocker residence at the time were Gerard Bocker and his daughters, Plaintiffs

Hannah Bocker and Sarah Bocker.  (*Id.* at ¶¶ 5, 28)  Mr. Bocker died due to the crash.  (*Id*. at ¶

31)  Hannah Bocker lived but was severely burned.  (*Id*. at ¶ 32)  Sarah Bocker also lived; she

was able to jump out of a window of the house and suffered some resulting injuries.  (*Id*. at ¶ 33)

Plaintiff Barbara Bocker, Mr. Bocker's wife and the mother of Hananh and Sarah Bocker, was

not on site; she was later named as the Administrator of Mr. Bocker's estate.  (*Id*. at ¶¶ 3, 5; D.I.

51 at 2)  The pilot, Mr. Knipping-Diaz, died in the crash, while the two passengers survived.

(D.I. 48 at ¶¶ 20-21)

The aircraft was equipped with two (L)TSIO-520-AE3B piston engines ("the engines");

these engines were designed and manufactured by Continental.  (*Id*. at ¶¶ 36-37)  The SAC

alleges that the reason the aircraft crashed was that its engines were not capable of making

sufficient power to remain airborne and suffered a "powerplant failure[,]" leaving them "unable

to perform as a result."  (*Id*. at ¶¶ 67, 73)  The SAC also makes clear, in turn, that:  (1) the

engines were "equipped with turbo components[,]" referred to in the SAC as "turbochargers[,]"

which had been "incorporat[ed]" into the engines at some point after the engines were

manufactured; (2) the purpose of turbocharging an engine is to increase its performance at higher

altitudes, as the air thins and becomes less dense, so that the fuel/air mixture can remain at or

close to sea level; and (3) it was these turbochargers that "malfunction[ed]" and that "cause[d]

and contribute[d] to the power loss experienced on board the aircraft[,]" resulting in the crash. (*Id*. at ¶¶ 36, 45, 79, 89; *see also* D.I. 51 at 10; D.I. 55 at 4)

The SAC appears to allege two possible theories as to why or how the aircraft crashed, both of which appear to be related to the engine's turbochargers.[1]  First, it notes that if the fuel/air mixture provided to the engine is not appropriate, or if the aircraft does not provide sufficient fuel or fuel free of contaminants, then the engine will not be able to make "rated power[.]"  (D.I. 48 at ¶¶ 68, 71)  The SAC also explains that if a "turbocharger malfunctions or seizes" then this can cause the engine to "not receive an appropriate fuel/air mixture and [that will, in turn] cause a loss of power."  (*Id*. at ¶ 46)  And it asserts that just before the crash, "the signatures in the propellers and control levers confirm that the aircraft was not making rated power on takeoff."  (*Id*. at ¶ 72)  Second, the SAC notes that "investigation reveal[ed] that the aircraft's turbocharger wastegates were in vastly different positions, with the left wastegate nearly closed, confirming that the engine was demanding additional boost in reaction to a malfunction of the engine" and that post-accident, there was evidence of a "turbocharger seizure or induction blockage" that had caused the left "wastegate on [the] engine [to] attempt to raise the manifold pressure[.]"  (*Id*. at ¶¶ 69-70)

In the factual background sections of the SAC,[2] Plaintiffs repeatedly plead that Defendant Hartzell Engine Technologies, LLC ("Hartzell") "made" and "manufactured" the

---

[1]      It could be that these allegations (which are mixed together largely in paragraphs 68 to 72 of the SAC) are not meant to reference to two separate theories, but instead one combined theory.  It is difficult to say since the SAC, as will be further discussed below, is difficult to construe.

[2]      The SAC is structured as follows.  First, there is a section titled "The Parties" (which provides some basic factual allegations about the parties to the suit) and one titled "Jurisdiction and Venue" (which includes Plaintiffs' allegations about those subjects).  (D.I. 48 at ¶¶ 1-16)  Next, there are three sections in which Plaintiffs appear to be laying out the facts

turbochargers and their associated components (including wastegates and controllers) that were a part of the engines in the accident aircraft; the SAC also states that these turbochargers were "the responsibility of the defendant Hartzell." (*Id*. at ¶¶ 47, 49, 79, 89)  Although Hartzell manufactured the turbochargers and was responsible for them, in these factual background sections, the SAC also avers that Continental "specified and procured" the turbochargers or was responsible for their "design and procurement." (*Id*. at ¶¶ 49, 85; *see also id*. at ¶¶ 87, 89)  Moreover, at various places in the SAC, it is alleged that Continental was the "type certificate holder" and the "production [certificate] holder" for the aircraft's engines, and that this meant that Continental:  (1) "had a duty to ensure that the engines were airworthy and safe, and would not suffer a sudden and unforeseen loss of power"; (2) "was responsible to ensure that the engines, including their turbocharging systems, functioned"; (3) "holds responsibility for airworthiness and functionality of the engine assembly, to specifically include its turbocharging system"; and (4) bears "ultimate responsibility for the defects in the turbocharging systems of the accident engines[.]" (*Id*. at ¶¶ 19, 81-82, 86, 88)

Further relevant allegations in the SAC will be discussed in Section II below.

### B.    Procedural Background

Plaintiffs filed their original Complaint initiating this case on August 12, 2021.  (D.I. 1)  Shortly thereafter, Plaintiffs filed a First Amended Complaint ("FAC").  (D.I. 9)  United States

---

relevant to the accident and, relatedly, to the allegations of liability later found in the Counts of the SAC:  "Factual Background[,]" "Background of the Accident Aircraft and its Engines" and "Accident Investigation[.]" (*Id*. at ¶¶ 17-89)  For ease of reference, the Court has and will refer to these three sections herein as the "factual background" sections of the SAC.  Next there is a section titled "Damages" that includes the allegations related to that topic.  (*Id*. at ¶¶ 90-110)  And thereafter, the various Counts are pleaded:  Counts I-VI against Continental (described below) and Counts VII-XII against Hartzell (which plead the same six types of claims against Hartzell that are pleaded against Continental).  (*Id*. at ¶¶ 111-220)

District Judge Maryellen Noreika, to whom this matter is assigned, has referred the case to the

Court to hear and resolve all pre-trial matters up to and including expert discovery matters.  (D.I.

28)

Continental then moved to dismiss the FAC as to it (the "first motion to dismiss"),

pursuant to Rule 12(b)(6).  (D.I. 13)  The Court thereafter issued a Report and Recommendation

(the "first R&R") recommending granting the first motion to dismiss as to all of the counts

(Counts I-VI) alleged against Continental.  (D.I. 46)  In doing so, the Court concluded that

Plaintiffs did not plausibly allege how Continental had either breached a duty owed to Plaintiffs

or otherwise made a product with a defect that is said to have proximately caused injury to

Plaintiffs.  (*Id.*)  The Court explained that the FAC never articulated "how—separate and apart

from Hartzell's alleged liability—Continental did anything wrong."  (*Id.*)  The Court

recommended that Plaintiffs be given an opportunity to further amend their complaint, in order

to attempt to state a claim against Continental; it also ordered that, in the interval, the case

against Continental was stayed.  (*Id.*)  Judge Noreika later adopted the first R&R, dismissing

without prejudice the claims against Continental and giving Plaintiffs 14 days to file a further

amended complaint against Continental.  (D.I. 47)

Plaintiffs filed the SAC on July 25, 2022.  (D.I. 48)  In the SAC, Plaintiffs again allege

six claims against Continental:  Count I (Strict Liability); Count II (Negligence); Count III

(Breach of Express and Implied Warranty); Count IV (Negligent Infliction of Emotional

Distress); Count V (Wrongful Death) and Count VI (Survival Action).  (D.I. 48)[3]  On August 8,

---

[3]      Count IV is brought only on behalf of Plaintiffs Hannah and Sarah Bocker; the
remaining counts against Continental are brought by all Plaintiffs.  (D.I. 48)

2022, Continental filed the instant motion, (D.I. 50), which was fully briefed as of September 13, 2022, (D.I. 55).[4]

## II.   DISCUSSION

With its Motion, Continental raises various issues.  For reasons set out below, the Court need not reach them all.  Instead, below, the Court will address only those issues it needs to, in order to explain why it recommends that Continental's Motion be granted.

### A.   Plaintiffs' Allegations Regarding Continental in Paragraphs 83-85, 89, 114, 116, 119-21, 124, 132-33, 137, 139-42, 148 of the SAC

With its Motion, Continental first takes issue with certain allegations found in paragraphs 83-85, 89, 114, 116, 119-21, 124, 132-33, 137, 139-42 and 148 of the SAC (the "paragraphs at issue").  (D.I. 51 at 5-6 (citing D.I. 48 at ¶¶ 83-85, 89, 114, 116, 119-21, 124, 132-33, 137, 139-42, 148))  Some background is in order to explain why.

As the Court noted above, (*see supra* pps. 2-3), in the factual background sections of the SAC, Plaintiffs allege that it was malfunctions relating to the turbochargers (which, in turn, had been incorporated into the engines at some point after the engines were manufactured by Continental) that caused the crash.[5]  (D.I. 48 at ¶¶ 67-73, 79, 89)  And as also noted above, (*see supra* pps. 3-4), in those same factual background sections of the SAC, the pleading makes it very clear that it was *Hartzell*—not *Continental*—that manufactured these turbochargers and that was "responsible" for them in that sense.  (*Id*. at ¶¶ 47, 49, 79, 89)  So when reading these portions of the SAC, the reader would understand that:  (1) Continental manufactured the

---

[4]      Hartzell has filed an answer to the SAC.  (D.I. 49)

[5]      When the Court refers to "turbochargers" herein, it means to refer to the turbochargers and their related components, such as wastegates.  (*See, e.g.*, D.I. 48 at ¶¶ 47, 69-70)

engines; (2) Hartzell manufactured the turbochargers; (3) sometime after Continental

manufactured the engines, Hartzell's turbochargers were incorporated into Continental's engines;

(4) sometime after that, the engines (including the turbochargers) were installed on the aircraft;

and (5) on the date of the accident, the turbochargers malfunctioned and caused the crash.[6]

       However, Continental notes that in the paragraphs at issue (many of which are found in

the body of Counts I-III against Continental), Plaintiffs make allegations that appear to contradict

all of the above.  (D.I. 51 at 7)  In the paragraphs at issue, Plaintiffs assert, *inter alia*, that it is

*Continental* that "designe[d]" and/or "manufacture[d]" and/or "remanufactured" and/or

"construct[ed]" and/or "overhauled" and/or "rebuilt" and/or "test[ed]" and/or "s[old]" and/or

"distribute[d]" and/or "procure[d]" and/or "supplied" and/or "provided" and/or "select[ed]

appropriate materials for" and/or provided "product support" for and/or "described and

advertised" and/or "provide[d] instructions" or "express warrant[ies]" and the like for the

turbochargers.  (D.I. 48 at ¶¶ 83-85, 89, 114, 116, 119-21, 124, 132-33, 137, 139-42, 148)  In

other words, whereas the factual background sections of the SAC had clearly alleged that

*Hartzell* is the company that made, or sold, or otherwise sent the turbochargers at issue out into

commerce, the paragraphs at issue muddy those waters by suggesting that *Continental* may have

done this instead.

---

[6]      In its briefing, Continental states that:  (1) it manufactured the two accident
engines in Iowa in early 2008; (2) it shipped the engines to a customer in Iowa in 2008; (3) the
turbochargers were installed on the engines after the engines left Continental's plant in Mobile,
Alabama; and (4) Continental had no subsequent contact with the engines until after the crash.
(D.I. 51 at 6)  It asserts that Plaintiffs have "known [these facts] for many months" in light of
discovery produced in this case and in a related litigation in New York state court.  (*Id.*)  Because
these more specific details (e.g., about the dates of manufacture, or the location of Continental's
plant) are not in the SAC, the Court cannot consider them here (nor does it need to) in resolving
the Motion.  In this Report and Recommendation, the Court will focus only on what is alleged in
the SAC.

But things get more confusing from there.  As Continental notes, (D.I. 51 at 7), the allegations in the paragraphs at issue (to the effect that *Continental* made/sold, etc., the turbochargers) are not only contradicted by what was earlier alleged in the SAC's factual background sections.  They are also contradicted by the allegations in the portion of the SAC that includes the counts brought against Hartzell (i.e., Counts VII-XII).  In those Counts, Plaintiffs assert repeatedly that it is *Hartzell* that "designe[d]" and/or "manufacture[d]" and/or "construct[ed]" and/or "overhauled" and/or "rebuil[t]" and/or "test[ed]" and/or "s[old]" and/or "distribute[d]" and/or "procure[d]" and/or "suppl[ied]" and/or "provided" and/or "select[ed] appropriate materials for" and/or provided "product support" for and/or "described and advertised" and/or "provide[d] instructions" or "express warrant[ies]" and the like for the turbochargers at issue.  (D.I. 48 at ¶¶ 167-68, 172-73, 186-87, 191, 193)  And the allegations in Counts VII-XII reiterate that it is "defendant *Hartzell* [that] is the entity responsible for the accident aircraft's turbochargers and component parts" and it was *Hartzell* (or its predecessor companies) that "originally sold" and "placed [the turbochargers] into the stream of commerce[.]"  (*Id*. at ¶¶ 169, 178 (emphasis added))

In light of all of this, Continental argues that the allegations in the paragraphs at issue should be stricken from the SAC pursuant to Rule 12(f).[7]  It asserts that this is so because the allegations therein (suggesting that Continental made, or designed, or sold, or originated in any

---

[7]      Rule 12(f) states, in relevant part, that a "court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f).  "[T]he purpose of a motion to strike is to clean up the pleadings, streamline litigation, and avoid unnecessary forays into immaterial matters." *Sepracor Inc. v. Dey, L.P.*, Civil Action No. 06-113-JJF, 2008 WL 4377570, at *2 (D. Del. Sept. 26, 2008) (internal quotation marks and citation omitted).  Motions to strike are generally disfavored and "usually will be denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties." *Id*. (internal quotation marks and citation omitted).

way the turbochargers) are "demonstrably false, misleading and prejudicial[,]" (D.I. 51 at 4), and

result in a SAC that includes "dozens of compound, grammatically tortuous, and borderline

incomprehensible[8] allegations" against it, (*id.* at 8).

The Court is not certain that striking this material from the SAC is the appropriate way to

go here.[9]  But it need not resolve this Rule 12(f) issue, because the allegations in these

paragraphs are wanting for another reason:  they are simply *not plausible*.[10]  Put differently, in

---

8        As Continental notes, there are also a number of typographical errors in the SAC
that at times make it difficult to read.  (D.I. 51 at 8 & n.2)

9        The content of the paragraphs at issue is not exactly "redundant, immaterial,
impertinent, or scandalous matter"—i.e., the kind of material that courts typically strike pursuant
to Rule 12(f).  They are not "redundant" matter in the sense that they do not amount to "needless
repetition" of the same allegation against the same party (instead, they are allegations about one
party that are also sometimes made against another party).  *Sliger v. Prospect Mortg., LLC*, 789
F. Supp. 2d 1212, 1216 (E.D. Cal. 2011) (internal quotation marks and citation omitted).  They
are not "immaterial" matter because they do have an "essential or important relationship to the
claim[s]" at issue.  *Del. Health Care, Inc. v. MCD Holding Co.*, 893 F. Supp. 1279, 1291-92 (D.
Del. 1995) (internal quotation marks and citation omitted).  They are not "impertinent" matter in
that they do "pertain . . . to the issues in question[.]"  *Id.* at 1292 (internal quotation marks and
citation omitted).  And they are not "scandalous" matter because they do bear a "possible relation
to the controversy[.]"  *Id.* (internal quotation marks and citation omitted).

Indeed, the real reason Continental is seeking to strike these allegations is that it believes
they are just simply "false" (and, relatedly, confusing).  (D.I. 51 at 4; D.I. 55 at 5)  But courts do
not typically strike material pursuant to Rule 12(f) because one side thinks that the allegations
against them are false.  *See Fox v. Lackawanna Cnty.*, NO. 3:16-CV-1511, 2017 WL 5007905, at
*12 (M.D. Pa. Nov. 2, 2017); *River Road Dev. Corp. v. Carlson Corp.—Ne.*, CIV. A. No. 89-
7037, 1990 WL 69085, at *7 (E.D. Pa. May 23, 1990).

10        Pursuant to Rule 12(b)(6), a party may move to dismiss the plaintiff's complaint
based upon the failure to state a claim upon which relief can be granted.  Fed. R. Civ. P.
12(b)(6).  The sufficiency of pleadings for non-fraud cases is governed by Federal Rule of Civil
Procedure 8, which requires "a short and plain statement of the claim showing that the pleader is
entitled to relief[.]"  Fed. R. Civ. P. 8(a)(2).  In order to survive a motion to dismiss pursuant to
Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a
claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal
quotation marks and citation omitted).  In assessing such a motion, the court first separates the
factual and legal elements of a claim, accepting "all of the complaint's well-pleaded facts as true,
but [disregarding] any legal conclusions."  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11

light of the fact that the SAC repeatedly alleges in its factual background sections that *Hartzell* is

the entity that manufactured and originated the turbochargers at issue (and then alleges that again

in the Counts against Hartzell), then it simply is not plausible to believe the contrary allegations

in the paragraphs at issue (to the effect that instead it was *Continental* who took those actions).

Where a plaintiff's own pleading is internally inconsistent and contradictory, the court is not

obligated to reconcile or accept such contradictory allegations. [11]  Thus, the Court will not credit

_____

(3d Cir. 2009).  Second, the court determines "whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'"  *Id.* at 211 (quoting *Ashcroft*, 556 U.S. at 679).

[11]    *See Mora v. Univ. of Tex. Sw. Med. Ctr.*, 469 F. App'x 295, 299 (5th Cir. 2012) ("Mora's complaint can be read as asserting that UTSMC retaliated against her by firing her for complaining about its unwillingness to accommodate her disability.  But this allegation is contradicted by the other facts alleged in the complaint, making the claim implausible on its face."); *Carson Optical Inc. v. eBay Inc.*, 202 F. Supp. 3d 247, 255 (E.D.N.Y. 2016) (noting that "a court is neither obligated to reconcile nor accept the contradictory allegations in the pleadings as true" when the allegations "are internally inconsistent") (internal quotation marks and citation omitted); *Dougherty v. Blize*, C.A. No. 07-674-SLR-LPS, 2008 WL 2543430, at *5 (D. Del. June 25, 2008) (same), *adopted in part by* 2008 WL 7278920 (D. Del. Oct. 7, 2008); *cf. Jaroslawicz v. M&T Bank Corp.*, 296 F. Supp. 3d 670, 676 (D. Del. 2017) (explaining that "the court need not accept as true allegations in the complaint contradicted by documents on which the complaint relies"), *vacated in part on other grounds*, 962 F.3d 701 (3d Cir. 2020).

        The Court acknowledges, of course, that a party in federal court may plead in the alternative.  But here, the Court does not read the SAC as actually attempting to plead in the alternative that *both* Continental and Hartzell made, sold and/or otherwise originated the turbochargers.  Instead, it understands the SAC to allege (particularly in light of the allegations in its factual background sections, quoted above) that *Hartzell* took these steps.  Indeed, it appears that the confusing and contradictory allegations in the paragraphs at issue (i.e., to the effect that *Continental* did so instead) could essentially be mistakes and/or the result of disordered pleading.  *Cf. Montoya v. City of Chicago*, 21 C 4596, 2022 WL 523105, at *1 (N.D. Ill. Feb. 22, 2022) (noting that while a plaintiff may plead in the alternative, the complaint's conflicting allegations rendered it impossible to discern what the plaintiff was alleging, and dismissing the claim for failure to give the defendant fair notice of the facts on which the claim rests); *Seagraves, Whiteface & Lubbock R.R. Co. v. Atchison, Topeka & Santa Fe Ry. Co.*, No. 93 C 1442, 1993 WL 524263, at *1 (N.D. Ill. Dec. 10, 1993) ("While pleading in the alternative is appropriate, and often necessary, Count V is needlessly confusing and must be dismissed.").

any of the allegations in the paragraphs at issue suggesting that Continental made, sold or took some other originating step with regard to the turbochargers on the aircraft.

Before leaving this topic, the Court notes one last factor, which also suggests that its conclusion here is the correct one. That is that, in their answering brief, Plaintiffs make no attempt to defend the allegations in the paragraphs at issue. In fact, with the exception of one sentence—a sentence in which Plaintiffs aver in a conclusory fashion that the allegations "Continental seeks to strike are wholly relevant to Plaintiffs' claims," (D.I. 54 at 6)—Plaintiffs simply ignored Continental's Rule 12(f) argument, (D.I. 55 at 6). In other words, in their answering brief, Plaintiffs never suggest that they *do* think that the SAC plausibly suggests that *Continental* made or sold or otherwise originated the turbochargers at issue. Nor do Plaintiffs argue that this is what they *actually intended to allege* in the SAC. Instead, in their answering brief, Plaintiffs suggest a different rationale for why the SAC's allegations against Continental could survive. And so the Court will take up that rationale below.

**B.      Plaintiffs' Other Allegations Regarding Continental's Liability**

In the SAC, Plaintiffs allege that Continental was the "type certificate holder" and "production certificate holder" for the engines on the aircraft. (D.I. 48 at ¶¶ 19, 81-82) Plaintiffs then assert that Continental "had a duty to ensure that the engines were airworthy and safe, and would not suffer a sudden and unforeseen loss of power" and they claim that this included the duty to ensure that the engines' "turbocharging systems[] functioned" properly. (*Id*. at ¶¶ 81-82) The SAC states that, as a result, Continental bears "ultimate responsibility for the defects in the turbocharging systems of the accident engines" that caused the crash. (*Id*. at ¶¶ 86, 88; *see also id*. at ¶¶ 113-15)

11

These allegations must be the ones that Plaintiffs think are key to Continental's liability

here.  That is because they are the only allegations that Plaintiffs pointed to in the Argument

section of their answering brief, when Plaintiffs were attempting to explain why their claims

against Continental were actually plausible.  (D.I. 54 at 6 (Plaintiffs asserting that the "SAC

specifies the responsibilities, and breaches thereof, Continental committed in relation to its role

as Type Certificate Holder and Production Certificate Holder, responsible for the engine, and the

engine accessories"); *id.* at 8 (Plaintiffs arguing that "[t]here is no doubt, even on the face of

Plaintiffs' SAC, that Continental is the entity who is the type certificate holder and responsible

for the airworthiness of the engines") (citing D.I. 48 at ¶¶ 81-89)) [12]

These allegations, however, do not plausibly explain how Continental could be liable,

pursuant to Counts I-VI, for a crash caused by the turbochargers—a product that Continental did

not make, or sell, or place into commerce in any way.  For one thing, the SAC never explains

what it means to be a "type certificate holder" or a "production certificate holder" with regard to

an engine found in an aircraft.  (D.I. 51 at 11 (Continental referring to this language as "murky

verbiage"))  Relatedly, the pleading never further articulates *why*, if the turbochargers at issue

---

[12]     The Court also notes that at times, the SAC asserts that Continental "specified"
and/or "procure[d]" and/or "design[ed]" the turbochargers and, "[a]s such, the flaws" that caused
the accident "were the ultimate responsibility" of Continental.  (D.I. 48 at ¶¶ 49-50, 85, 87, 89)
Plaintiffs do not reference these allegations in their answering brief, and so it appears that
Plaintiffs do not believe that they are material to assessing whether plausible claims against
Continental have been set out.  Moreover, as to the "specified" allegation, it is unclear from the
SAC:  (1) in what way Continental "specified" the turbochargers; (2) what it even means to
"specify" a product like this; and (3) how any such "specification" helps demonstrate why
Continental owed a duty relating to the turbochargers.  (D.I. 55 at 5)  As for the "procure[d]" and
"design[ed]" allegations, they appear to be contradicted by other allegations in the SAC, which
state it was Hartzell who made the turbochargers and "design[ed]" them.  (*See., e.g*., D.I. 48 at ¶¶
170-71)  Therefore, these "specified" and/or "procure[d]" and/or "design[ed]" allegations in the
SAC are confusing and implausible, and so the Court will not further consider them here.

were "incorporate[ed]" into Continental's engines after Continental manufactured the engines, Continental would nevertheless have a legal duty or responsibility to ensure that those turbochargers "functioned" properly.  (D.I. 48 at ¶¶ 81-82, 89)  What is it that Continental did that gave rise to this duty with regard to the turbochargers?  Did Continental sign some type of contract taking on such liability?  If the fact that Continental holds the above-referenced "certificates" has something to do with taking on such a duty, why or how is that so?  The SAC never says.  Instead it leaves the reader to guess at why Continental is being sued.  (D.I. 55 at 3) Such allegations do not set out a plausible claim for liability as to Continental regarding Counts I-VI. [13]

### C.   Conclusion and Nature of Dismissal

For the foregoing reasons, the Court recommends that the Motion be granted and that the claims against Continental in Counts I-VI be dismissed. [14]

---

[13]   The claims in Counts I-VI are all different claims with different elements, of course.  And the parties disagree about which state's law applies to those claims (with Plaintiffs preferring New York law and Continental preferring Delaware law).  (D.I. 54 at 11; D.I. 55 at 7) But no matter which state's law applies, as to each of the claims, there would at least need to be some plausible basis to believe that Continental took an action that rendered it responsible for the aircraft's turbochargers having malfunctioned (i.e., that Continental improperly designed or manufactured that product, or that Continental somehow had a duty with regard to the product, or that Continental made a representation about the product).  *See, e.g.*, *Flores v. Youm*, 133 N.Y.S.3d 786 (N.Y. Sup. Ct. 2020); *Barclay v. Techno-Design, Inc.*, 129 A.D.3d 1177, 1178-79 (N.Y. App. Div. 2015); *Fitzpatrick v. Currie*, 52 A.D.3d 1089, 1090 (N.Y. App. Div. 2008); *Schultes v. Kane*, 50 A.D.3d 1277, 1278 (N.Y. App. Div. 2008); *Earsing v. Nelson*, 212 A.D.2d 66, 70 (N.Y. App. Div. 1995); *see also* Del. Code tit. 10, § 3701; Del. Code tit. 10, § 3724; *Smith v. Liberty Mut. Ins. Co.*, 201 A.3d 555, 572 n.110 (Del. Super. Ct. 2019); *Abbate v. Werner Co.*, C.A. No. 09C-02-013 WLW, 2012 WL 1413524, at *1-2 (Del. Super. Ct. Jan. 19, 2012); *White v. APP Pharms., LLC*, C.A. No. N10C-04-061-CLS, 2011 WL 2176151, at *2-3 (Del. Super. Ct. Apr. 7, 2011).  The SAC lacks allegations to plausibly establish any of this, which is relevant to all six of the Counts against Continental.

[14]   With its Motion, Continental also sought:  (1) to have Counts I, III, V and VI against it dismissed on other grounds; and (2) to have the entire Complaint against it dismissed pursuant to the *Colorado River* abstention doctrine and/or the Court's inherent authority.  (D.I.

In their answering brief, Plaintiffs requested that if the Motion was to be granted, that they be permitted to further amend the SAC to attempt to state a claim against Continental, pursuant to Federal Rule of Civil Procedure 15(a)(2).  (D.I. 54 at 12)  That is a tough call for the Court.  On the one hand, the SAC is the third complaint Plaintiffs have filed, and this is the second instance in which the Court has found Plaintiffs' allegations against Continental to be wanting.  And Plaintiffs have had quite a long time since this case was initiated to muster a plausible claim against this Defendant.  On the other hand, the Court is always mindful that leave to amend should be given freely "when justice so requires[.]" Fed. R. Civ. P. 15(a)(2).  And it is difficult to say that it would be impossible for Plaintiffs to make out a claim against Continental—were Plaintiffs' allegations simply more robust, focused and coherent.  In light of all of this, the Court recommends that Plaintiffs not be permitted to further amend their complaint against Continental unconditionally.  Instead, it recommends that if the District Court affirms this Report and Recommendation, and Plaintiffs wish to attempt to further amend, that they first be required to file a motion for leave to amend (one that attaches the proposed amended pleading), *see Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 252 (3d Cir. 2007), within 14 days of the District Court's order.

## IV.      CONCLUSION

For all of the above reasons, the Court recommends that the Motion be GRANTED and that Counts I-VI against Continental be DISMISSED.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1.  The parties may serve and file specific written objections

---

51 at 12-20)  Because the Court is recommending dismissal of the claims against Continental on the previously-referenced grounds, it need not address these issues.

within fourteen (14) days after being served with a copy of this Report and Recommendation.

Fed. R. Civ. P. 72(b)(2).  The failure of a party to object to legal conclusions may result in the

loss of the right to de novo review in the district court.  *See Sincavage v. Barnhart*, 171 F. App'x

924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

    The parties are directed to the Court's Standing Order for Objections Filed Under Fed. R.

Civ. P. 72, dated March 7, 2022, a copy of which is available on the District Court's website,

located at http://www.ded.uscourts.gov.


Dated:  January 26, 2023

                                                         *Christopher J. Burke*
                                                         Christopher J. Burke
                                                         UNITED STATES MAGISTRATE JUDGE